**UNITED STATES, Appellant,**

v.

**John D. CALHOUN, Appellee.**

No. 10142.

District of Columbia Court of Appeals.

Argued May 13, 1975.

Decided Aug. 13, 1976.

Daniel A. DeRose, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry and Albert H. Turkus, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

Leroy Nesbitt, Washington, D.C., appointed by the court, for appellee.

Before KELLY, GALLAGHER and NEBEKER, Associate Judges.

KELLY, Associate Judge:

Appellee was arrested on June 27, 1974, in connection with the death of his common-law wife from a stab wound. He was released at the preliminary hearing to a third party custodian and, on August 6, was indicted for second-degree murder. At his arraignment two weeks later bond was set at $2,000; however, as he was unable to satisfy this bond requirement, appellee was incarcerated pending trial. On September 10, 1975, after a six-day pretrial hearing, the trial judge dismissed the indictment for lack of a speedy trial. Concomitantly, in the interest of judicial economy, the trial judge ruled that certain oral statements and a written statement were inadmissible as they were elicited from appellee in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The United States appeals these rulings pursuant to D.C.Code 1973, § 23–104(a)(1) and —(c).

I

The indictment was dismissed fourteen and one-half months after appellee's arrest. We assess this delay by applying the Supreme Court's analysis in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which rejected any rigid approach to the speedy trial problem and adopted instead a balancing test "in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 530, 92 S.Ct. at 2192; footnote omitted. In adopting such a test the Court stated:

A balancing test necessarily compels courts to approach speedy trial cases on

an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. [*Id.*; footnote omitted.]

The trial date originally set was November 11, 1974, four and one-half months after appellee's arrest. On that date defense counsel requested and was granted a continuance to January 21, 1975, to allow a Public Defender Service (PDS) investigator to complete a pretrial investigative report.[1] On January 21, defense counsel again requested a continuance as he was still unprepared for trial despite the fact that the PDS investigative report had been completed on January 15. The court found this lack of preparation inexcusable and summarily removed counsel from the case. New counsel was appointed and a third trial date was set for April 1.

On April 1, the government was unable to proceed to trial due to the illness of the Assistant United States Attorney assigned to the case.[2] The court requested a recommendation for a new trial date and defense counsel suggested July 22. The government indicated any trial date after Thursday (the hearing was on a Tuesday) was agreeable but, the fourth trial date was nevertheless set for July 22. On that date, as the trial judge was engaged in another proceeding, the trial was delayed one week. On July 29, a jury panel was unavailable and this necessitated the resetting of trial for September 2.

On July 10, defense counsel filed a motion to dismiss the indictment for lack of a speedy trial. Appellee's previous counsel had filed a motion to suppress in October 1974. A pretrial hearing commenced on September 2, and on September 10 both motions were granted. Relying on the guidelines enunciated in *Barker v. Wingo supra,* the court identified three periods of delay and attributed each to the government. The first period extended from appellee's arrest through the first two trial continuances to the third trial date of April 1. PDS' failure to speedily conclude a pretrial investigation in time for the initial trial date was attributed to a lack of adequate funding which caused an understaffing of the investigative section. Therefore, the court ruled that the responsibility for the delay from November 11 to January 21 must be borne by the government as the PDS is a government agency. The delay from January 21 to April 1, caused by the alleged ineffective assistance given to appellee by his first counsel, was likewise attributed to the government. The court refused to allow appellee to bear the consequences, in terms of a ruling on his speedy trial motion, of such ineffective assistance.

In ruling on the second period of delay from April 1 to July 22, the court stated that as this murder case was not complex, the government should have gone forward with the trial on April 1 by assigning the case to another prosecutor. Because the government chose instead to seek a continuance it must bear responsibility for the delay.

The third period which the court attributed to the government began on July 29 when the trial was continued until Septem-

---

1. Defense counsel was not a PDS attorney but was utilizing a service offered by the PDS to private defense attorneys who are court appointed. *See* D.C.Code 1973, § 2–2222 (a).

2. At this time appellee was represented by new counsel. He also was appearing before

a judge different from the one who had granted his two earlier continuances and who had removed his first counsel. The case in accordance with normal calendar rotation had been certified to this new judge on February 27.

ber due to the lack of sufficient jurors on the 29th to complete the jury panel. In sum, the ten-month period from November 11, 1974 to September 10, 1975 was attributed to the government.

Additionally, the court ruled that the fourteen and one-half month delay had prejudiced the appellee in that the memories of the investigating police officers had faded to the point where it would be impossible for the appellee "to nevertheless prove the lack of credibility, or the actual truth or actual facts from witnesses of the Government." Lastly, the court ruled that defense counsel by filing a motion to dismiss for lack of a speedy trial on July 10, had asserted appellee's right in a timely manner.

■ We do not agree with the reasoning which held the government responsible for the delay of November 11 to April 1 and find unacceptable the rationale that because PDS is a publicly-funded agency, the responsibility for pretrial investigative delays, for whatever reasons, must be borne by the government. More importantly, the record discloses that the November 11 continuance was requested by defense counsel and was granted by the first trial judge in order to secure for appellee his Sixth Amendment right "to have the Assistance of Counsel for his defense." This continuance was necessary for appellee's counsel to prepare a defense and it would be irrational to attribute that period of delay to the government in a ruling on appellee's other Sixth Amendment right to a speedy trial. The second continuance

was requested for the same reason and was granted not only to enable appellee to prepare his defense but also to insure that he did indeed receive adequate assistance of counsel. As both continuances were requested by counsel for appellee, the government cannot be held responsible for the trial delays caused by them.[3]

■ On April 1, after the government informed the court that it was unable to proceed because the prosecutor assigned to the case was ill, the following dialogue occurred:

[DEFENSE COUNSEL]: Your Honor, I have no objection to a continuance in view of the illness.

THE COURT: Recommend a date.

[DEFENSE COUNSEL]: The date of July 22, 1975.

[GOVERNMENT COUNSEL]: Mr. Robinson has authorized me to inform the Court he would be available any time after Thursday that the Court wishes to set the trial; therefore that date I am sure would be agreeable.

The reason for a four-month continuance in the face of the government's willingness to try the case within a few days is not disclosed in the record.[4] However, it is clear that appellee's counsel was not disturbed by a four-month continuance notwithstanding the fact that at this time appellee had been incarcerated for nine months. Also, there was no discussion about the feasibility or desirability of assigning another prosecutor to the case.[5]

---

3. The United States Court of Appeals for the Second Circuit in interpreting a local rule on prompt disposition of criminal cases, has stated: "The delay resulting from appellant's counsel's lack of readiness cannot be charged against the government." *United States v. Johnson*, 525 F.2d 999, 1007 (2d Cir. 1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (1976).
The American Bar Association Project on Standards for Criminal Justice, Speedy Trial 25 (Approved Draft 1968) states:
2.3 Excluded periods.

The following periods should be excluded in computing the time for trial:
\* \* \* \* \*
(c) The period of delay resulting from a continuance granted at the request or with the consent of the defendant or his counsel. . . .

4. The government asserts in its brief that it was due to a crowded court calendar.

5. In any event, such a suggestion would have been totally impractical for at the very least the government would have to

Defense counsel, the prosecutor and the trial judge all agreed that a four-month continuance was appropriate and acceptable. While we recognize the injustice of imprisoning for long periods before trial individuals who ultimately may be acquitted,[6] we cannot hold the government responsible for this delay where it requested only a short continuance and was willing to proceed to trial expeditiously but nevertheless acquiesced in a four-month continuance suggested by defense counsel.

■ In assessing the last delay of one month, it is noted that the responsibility for lengthy delays caused by administrative inefficiency must · ultimately be borne by the government and not by the defendant. *Barker v. Wingo, supra,* at 531, 92 S.Ct. 2182. We do not think that this delay raises a serious speedy trial issue, however, for such delays are, by necessity, weighed less heavily against the government than deliberate delays to impede the defense. *Id.*

■ Having examined the length of delay in this case and the reasons for it, we are unable to sustain the court's finding that ten months of the fourteen and one-half month delay was due solely to the prosecution's culpability. Nor can we agree that appellee's assertion of his right to a speedy trial on July 10, 1975 was timely. Appellee's counsel suggested the four-month continuance from April 1 to July 22, and while the record is silent as to the underlying reason for the length of the delay it is clear that counsel did not object to ap-

pellee's further incarceration for this period of time. We note that the Court in *Barker v. Wingo, supra* at 531–32, 92 S.Ct. at 2192, stated:

> The defendant's assertion of his speedy trial right, . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

Thus appellee's assertion of his right to a speedy trial after either initiating or consenting to several continuances is not, in these circumstances, entitled to strong evidentiary weight.

■ Finally, we dispute the finding that appellee was prejudiced by the delay. The principal justification for the ruling was that the prosecution's witnesses, all police officers, could not recall the exact sequence of events which occurred or the exact content of interviews which were taken after their respective arrivals at the scene of the crime. But in *Barker v. Wingo, supra* at 532, 92 S.Ct. 2182, the Court observed that the most important factor in determining whether a defendant had been prejudiced is any impairment of his defense caused by the delay, noting that defense witnesses may die, may disappear or may not accurately recall events. Here the court stated that the prosecution witnesses could not accurately remember past events and therefore appellee would be hindered in preparing a defense. Whatever the

---

be granted a few days to prepare a new prosecutor for trial and by that time the assigned prosecutor would have been recovered and able to try the case himself.

6. The Court in *Barker v. Wingo, supra* at 532–33, 92 S.Ct. at 2193, stated:

> The time spent in ·jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a

defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent. Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility. . . . [Footnotes omitted.]

merits of such an observation,[7] there is no evidence that the appellee was hampered by the delay in either preparing or in establishing his defense. Indeed, appellee's original counsel requested the January continuance in order to subpoena medical records of the decedent in order to attempt to prove that a suicide rather than a homicide had occurred.

In balancing and weighing the length of delay, the reason for it, appellee's assertion of his right, and any possible prejudice to appellee, we find that the court erred in granting the motion to dismiss the indictment.

## II

Because the indictment must be reinstated, we also address the merits of the ruling on the motion to suppress statements made to the police by appellee. At the six-day pretrial hearing seven police officers and appellee testified about the events that occurred after the police arrived at the scene. This testimony discloses that on June 27, 1974, at approximately 10:20 p.m., Metropolitian Police were summoned to the Warren Hotel at 1024 10th Street, N.W. Upon arrival, Officers Chalius Jones and James Bailey were directed by the resident manager to appellee John D. Calhoun's apartment where they found the body of a woman lying on a bed and Calhoun sitting nearby. Calhoun immediately volunteered that the woman had committed suicide. The officers asked what happened and Calhoun stated that he had been sleeping with the woman and that he awoke and attempted to arouse her so that she could get him a glass of water but she did not awaken. At 10:30 p.m., shortly after Officers Jones and Bailey's arrival, Sergeant James O. Williams and Detective Sergeant Ronald S. Fuska arrived at the scene. They went directly to the second floor of the building where they encountered Calhoun sitting on the stairway with a police officer standing beside him. The sergeants accompanied by Calhoun went to the apartment where Sergeant Williams examined the body and determined that the woman had been dead for some time. In response to Sergeant Williams' query, Calhoun repeated with more elaboration what he had just told Officers Jones and Bailey. He stated that the woman was his common-law wife and that shortly after dark they had gone to bed. At some time he had awakened and asked her to get him a glass of water. She had gotten up and gone to the bathroom down the hallway from the bedroom. After that she came back to bed and a short time later he awoke for a second time. Again he desired a glass of water but this time when he attempted to arouse his wife she did not respond. He summoned a neighbor who determined that his wife was dead. He then called the police and an ambulance. Calhoun also stated that his wife had in the past attempted suicide by slashing her wrists and that tonight she had stabbed herself with a knife. Sergeant Williams at this time noted an inconsistency between Calhoun's assertion that his wife had gone to the bathroom shortly before he called police and his observation that she appeared to have been dead for some period of time.

Next to arrive at the scene were Homicide Detectives Hosea Dyson and James W. Slawson in one police car and Detective Raymond J. Greene in another. Detective Dyson met Calhoun seated on the building's front steps with a uniformed officer standing beside him. The officer told Detective Dyson that Calhoun was the husband of the dead woman upstairs. The officers and Calhoun then proceeded to the apartment but before entering it Detective Dyson asked Calhoun what happened. Calhoun again recited his story, with still more variations, that he had earlier told to Sergeant Williams. After examining the room and the body, Detective Dyson told

---

7. In *United States v. Lynch*, 163 U.S.App. D.C. 6, 15, 499 F.2d 1011, 1020 (1974), the contrary conclusion was expressed that . . . the loss of memory by witnesses over long periods of time will ordinarily be less prejudicial to the defendant than to the prosecution, which bears the burden of proof at the trial.

Calhoun that he must go to the station to give a written statement. Calhoun objected, but when told that it was routine police procedure, agreed to go.

Detective Greene, having arrived shortly after Detective Dyson and Slawson, was informed by other officers on the scene about the woman's death and Calhoun's story. After examining the scene, Detective Greene approached Calhoun in the hallway and read to him his *Miranda* rights. Although he did not place Calhoun under arrest, he stated at the pretrial hearing that as a matter of practice he gives *Miranda* warnings to whomever he questions at the scene of a crime.

At the police station Detectives Dyson, Greene, Myers and Slawson conferred and decided to formally charge Calhoun. Detective Dyson read to Calhoun his *Miranda* rights and after signing a waiver of rights on form PD–118,[8] he gave a statement which was typed by Detective Dyson and signed by Calhoun. The statement, given between 11:30 p.m. and 12:01 a.m., was entirely exculpatory and with minor variations was consistent with Calhoun's earlier version given to the police at the scene of the crime.

Calhoun testified that he remembered talking to the police at the scene but could not remember either what he said or what they said. He did remember being advised of his rights at the police station and he also remembered giving a statement. He acknowledged that the signature following the statement was his and that the one next to the waiver of rights section was likewise his. The answer to the printed question on the PD–118, "Do you wish to answer any questions?" was no; however, the word "no" was crossed out and the

word "yes" was printed next to it. Calhoun testified that the printed word "yes" was not his but that the signature next to it was his.

The court ruled that Calhoun's initial oral statement to Officer Jones was voluntary and admissible but ruled:

It is the finding of this Court that after his initial investigation, Officer Jones reasonably and properly concluded that the matter was a criminal case. Every officer who appeared on the scene thereafter, whether alerted by himself, or by the runs on the radio channels, should have properly warned Mr. Calhoun of his rights, that he was a suspect, that he was probably under arrest, and all of the other requirements of *Miranda*.

Thus, the remaining oral statements were suppressed, as was the written statement, as a "fruit of the poisonous tree."

 The court's suppression of appellee's statements is erroneous. In *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the Supreme Court rejected the argument that once a criminal tax investigation has focused on an individual that *Miranda* warnings must precede any interview of that suspect. In so holding the Court reaffirmed that *Miranda* is aimed at dispelling the coerciveness inherent in custodial interrogation and that custody triggers the need for warnings, not the suspicions of the investigating official. Here, while some of the officers may have doubted Calhoun's story, the mere questioning of Calhoun at the scene by several officers' was not equivalent to in-custody interrogation.[9] Nor can the mere presence of numerous officers at the scene be equated with custodial interrogation.

---

8. This is a standard Metropolitan Police Department form entitled Defendant/Suspect Statement which in the first section contains a waiver of rights provision.

9. In *Hicks v. United States*, 127 U.S.App. D.C. 209, 212, 382 F.2d 158, 161 (1967), it was stated:

An assumption that one is required to cooperate with the police can hardly be

equated with an arrest; every citizen has a duty to assist police officers up to the point of self-incrimination. The co-operative innocent person would find it oppressive indeed if courts were to hold every person interrogated must first be taken before a magistrate and subjected to the judicial processes applicable to a person criminally charged, i. e., warned that he had a right to maintain silence and

 The police officers conducted an investigation of an unexplained death by interviewing the person who had summoned them and by examining the scene. Calhoun was asked to come to the police station to give a statement concerning the death of his wife which he claimed was a suicide. After the investigating officers conferred at the station, they decided to formally charge Calhoun. He was read his *Miranda* warnings the moment the police decided to take him into custody. The record does not disclose any threats, cajolery or prolonged interrogation which would tend to support a claim of involuntariness.[10] This, coupled with the fact that Calhoun admitted that the signatures acknowledging the waiver of rights and the authorship of the statement were his, compels the conclusion that the waiver was knowingly and intelligently executed and the statement was voluntarily given. The record in its entirety reveals a routine police investigation into a stabbing death; it fails to support the ruling suppressing the oral and written statements of appellee.

*Reversed wih instructions to reinstate the indictment.*

to counsel as a preliminary to interrogation.

10. Calhoun testified that he was at the police station three to four hours; however, his statement was given immediately after his arrival at 11:30 p. m., only a little over an hour after he originally summoned police to his apartment.