Edward D. DAY, Appellant,

v.

UNITED STATES, Appellee.

No. 11272.

District of Columbia Court of Appeals.

Argued Oct. 19, 1977.

Decided July 10, 1978.

Rehearing and Rehearing En Banc
Denied Nov. 21, 1978.

Peter Sissman, Arlington, Va., with whom Lawrence Lataif, Arlington, Va., was on the brief, for appellant.

E. Thomas Roberts, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before KELLY * and FERREN, Associate Judges, and PAIR, Associate Judge, Retired.

FERREN, Associate Judge:

Appellant asks us to set aside his convictions on charges of first-degree felony murder (D.C.Code 1973, § 22–2401) and armed robbery (D.C.Code 1973, §§ 22–2901, –3202) on two grounds: (1) the trial court erred in refusing his request for jury instructions on the lesser offenses of manslaughter, assault with a deadly weapon, and assault; and (2) the 32½-month delay between arrest and trial violated his Sixth Amendment right to a speedy trial. We find no error or constitutional infirmity; we affirm appellant's convictions.

### I.

On the evening of November 1, 1973, Joseph Sutton, a 72-year-old pensioner residing at an apartment at 1341 East Capitol Street, visited his cousin, Gorham Pearsall, who lived a few blocks away. The two of them walked to 18th and D Streets, S.E., to visit a mutual friend whose wife had recently passed away. Mr. Pearsall testified that after spending approximately an hour sharing a pint of liquor with their friend, he and Mr. Sutton walked back toward their own neighborhood. He further testified that he last saw Mr. Sutton at approximately 11:00 p. m. in the vicinity of 14th Street and Massachusetts Avenue, S.E. At that point, Mr. Sutton was in his normal state of health and was carrying some money from a pension check he had cashed that day.

According to Mrs. Joan King and her two sons, Michael and Maurice, whose apartment at 1341 East Capitol was across the hall from Mr. Sutton's and overlooked the entrance to the building, Mr. Sutton returned home on November 1 at about 9:00 p. m. Michael King, who was ten years old at the time, testified that as Mr. Sutton started up the walkway to the apartment he was attacked from the rear by a man whom Michael King identified as appellant. When Mr. Sutton attempted to stand up, appellant assaulted him twice more and then reached into Mr. Sutton's pocket. Ap-

* Associate Judge Kelly participated at oral argument but not in the decision of this case.

pellant pulled something out, discarded part of it, and put the rest of it into his own pocket.

Maurice King, then twelve years old, testified to witnessing the last few minutes of this assault from his apartment window overlooking the building's entrance. He said that he had seen a stick in the hands of appellant (whom he identified) about the size of a broom handle, although he had not seen appellant use it on the decedent. Mrs. King testified that she had arrived at the window just in time to see a man (whom she also identified as appellant) walk away from the scene, and that she then had gone down to the sidewalk where she found Mr. Sutton with a swollen face and blood on his clothes. There was also blood on the ground near where he lay. She assisted Mr. Sutton up to his apartment where she found him the next morning lying on the floor, his face still swollen and covered with dried blood. The police were notified.

Although he had difficulty speaking, Mr. Sutton told Officer Robert Condit of the Metropolitan Police Department that as he was coming in the front door of the building at 1:00 a. m. he had been approached by a man who had first asked him, "Where is your money?" When Mr. Sutton did not reply, the man started to beat him on the back—he thought with a stick.

Mr. Sutton was taken to the hospital, suffering from massive swelling of the facial and neck area, a fractured rib and mandible, and a broken hyoid bone. In his struggle to clear his breathing passage, he vomited, aspirated, and as a result suffered cardiac arrest. Although he was revived, he remained in a comatose state from which he never recovered. When he died two weeks later, the cause of death was determined to be a general infection of the lungs and body, meningitis, and jaundice.

The defense case was limited to one witness, Melvin Clark, Jr., a young man who testified that he had observed Mr. Sutton being assaulted by two persons other than appellant. Melvin Clark further testified, contrary to all other witnesses, that the incident had taken place about 8:00 p. m.

when it was "semi-dark" during the spring or summer. The prosecutor elected not to cross-examine.

## II.

The trial judge instructed the jury on the crimes of murder in the first degree, murder in the second degree, armed robbery, and robbery, all of which were included in the indictment.

### A. Request for Lesser-Included Offense Instructions

■ Appellant contends that the trial judge erred in denying requests for additional instructions on the crimes of manslaughter, assault with a deadly weapon, and simple assault. A defendant is entitled to a lesser-included offense instruction when (1) all elements of the lesser offense are included within the offense charged, Sansone v. United States, 380 U.S. 343, 349–50, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); Berra v. United States, 351 U.S. 131, 134, 76 S.Ct. 685, 100 L.Ed. 1013 (1956); Pendergrast v. United States, D.C.App., 332 A.2d 919, 924 (1975), and (2) there is a sufficient evidentiary basis for the lesser charge. Id.; United States v. Comer, 137 U.S.App.D.C. 214, 218, 421 F.2d 1149, 1153 (1970).

■ As to the first requirement, appellant is correct that manslaughter "long has been recognized as a lesser included offense of second degree murder." Pendergrast v. United States, supra at 924. Accord, Stevenson v. United States, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); United States v. Comer, supra; Belton v. United States, 127 U.S.App.D.C. 201, 382 F.2d 150 (1967). The answer is more complex with respect to the requested assault instructions, but there is support for the view that assault can be a lesser-included offense in a robbery, see United States v. Bauer, 198 F.Supp. 753 (D.D.C.1961), and even dicta to the effect that assault can be a lesser-included offense in a homicide. Logan v. United States, 144 U.S. 263, 307, 12 S.Ct. 617, 36 L.Ed. 429 (1892) (dicta); United States v. Hamilton, 182 F.Supp. 548, 551

(D.D.C.1960) (dicta).[1] We therefore cannot say that appellant's request for lesser-included offense instructions must be automatically denied. We are obliged, as a result, to apply the second requirement for a lesser-included offense—the need for a sufficient evidentiary basis—to which we now turn.

A lesser-included offense instruction will not be proper unless proof of the greater offense charged will require the jury to find a disputed fact that need not be found to prove the lesser offense. *Sansone v. United States, supra.* Once a defendant asserts that there is such a factual dispute, the court must give a lesser-included offense instruction if "there is some evidence upon the subject." *Stevenson v. United States, supra,* 162 U.S. at 314, 16 S.Ct. at 839. This evidentiary requirement is a minimal one; it means " 'any evidence' . . however weak." *Belton v. United States, supra,* 127 U.S.App.D.C. at 206, 382 F.2d at 155. *Accord, Pendergrast v. United States, supra,* at 925.

In *United States v. Comer, supra,* 137 U.S.App.D.C. at 219, 421 F.2d at 1154, the District of Columbia Circuit Court of Appeals adopted the procedural approach of the First Circuit in *Driscoll v. United States,* 356 F.2d 324, 327 (1st Cir. 1966), *vacated on other grounds,* 390 U.S. 202, 88 S.Ct. 899, 19 L.Ed.2d 1034 (1968), requiring a two-step inquiry:

> "We take *Sansone* to mean that [1] when the government has made out a compelling case, uncontroverted on the evidence, on an element required for the charged offense but not for the lesser-included offense, there is [2] a duty on defendant to come forward with some evidence on that issue [*i. e.,* on the element uniquely

required for the charged offense] if he wishes to have the benefit of a lesser-included offense charge. * * * *Two prerequisites* [to denying a lesser-included offense instruction] *seem vital: [a] that there be no factual dispute and [b] that a finding contrary to the only evidence on the issue would be irrational."* (Emphasis by D.C.Circuit Court.)

It is important to note, therefore, that even when there is no dispute about the facts tending to prove the element uniquely required for the charged offense, it is still possible that a lesser-included offense instruction will be necessary, for "the court must appraise all the testimony and evidence to determine whether it is capable of more than one reasonable inference." *United States v. Comer, supra,* 137 U.S. App.D.C. at 219, 421 F.2d at 1154. On undisputed facts capable of only one inference, however, no lesser-charge instruction will be proper, let alone required.

In the present case, the element of the second-degree murder charge not required for manslaughter is malice; thus, the first step toward a lesser-included offense charge for manslaughter can be taken. However, we do not find " 'any evidence' . . . however weak" that would support a jury finding of no malice. It is undisputed that Mr. Sutton was brutally beaten. The only dispute was whether appellant or others did it. There was no evidence of provocation, self-defense, or any other circumstance that would negate a jury finding of malice. Any conclusion by the jury to the contrary "would be irrational." *Id.*

As to the requested assault instructions, the only defense witness, Melvin

---

1. The District of Columbia Circuit Court of Appeals has held that under a robbery indictment the government must prove assault and larceny, *United States v. McGill,* 159 U.S.App. D.C. 337, 487 F.2d 1208 (1973)—implying that assault is therefore a lesser-included offense in robbery and armed robbery. Both the Circuit and District Courts have noted, however, that under D.C.Code 1973, § 22–2901, robbery can involve merely "stealthy seizure," *Hunt v. United States,* 115 U.S.App.D.C. 1, 316 F.2d 652 (1963); *Irby v. United States,* 250 F.Supp. 983 (D.D.C.1965) *aff'd,* 129 U.S.App.D.C. 17, 390

F.2d 432 (1967)—implying that robbery may not always include criminal assault. It also is clear that assault with a deadly weapon is not necessarily included within robbery, *Crosby v. United States,* 119 U.S.App.D.C. 244, 339 F.2d 743 (1964); *United States v. Bauer, supra.* Assault with a deadly weapon, however is included within armed robbery. *Franey v. United States,* D.C.App., 382 A.2d 1019, 1021 (1978); *Taylor v. United States,* D.C.App., 324 A.2d 683, 685 (1974); *Skinner v. United States,* D.C.App., 310 A.2d 231, 233 (1973).

Clark, Jr., testified to seeing two persons, other than appellant, beat Mr. Sutton. Therefore, in his opening and closing statements to the jury, defense counsel suggested that Mr. Sutton was the victim of a second beating which included the fatal blow. Appellant now argues that Mr. Clark's testimony created "some evidence" that appellant—as but one of the attackers—could be guilty at most of assault with a deadly weapon. Although "the jury's role as fact-finder is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a lesser included offense, if it is requested," *id.*, we cannot overlook the fact that Mr. Clark's testimony was simply not credible. His placement of the incident in the spring or summer at approximately 8:00 p. m. when it was "semi-dark" was so unbelievable, in contrast with the testimony of four other witnesses, that the prosecutor did not cross-examine and the trial judge, at a bench conference, expressed condolences to defense counsel after Mr. Clark had testified. When the only defense witness is so incredible as to provide no plausible evidence at all in support of the defendant's theory of the case, it does not reach the level of "some evidence on the subject" required for the lesser-included offense instruction.[2]

We conclude, therefore, that the evidence provides "no rational basis for a lesser charge" of assault with a deadly weapon, let alone simple assault. The court was "not required to put the case to the jury on a basis that essentially indulges and even encourages speculations as to bizarre reconstruction." *United States v. Sinclair*, 144 U.S.App.D.C. 13, 15, 444 F.2d 888, 890 (1971).

**B. *Request for Instruction on Defendant's Theory of the Case***

Appellant argues, next, that the trial court abridged appellant's right to have the jury instructed on his theory of the case. *See Bailey v. District of Columbia*, D.C.App., 281 A.2d 440 (1971). This rule has broader application than protection of a defendant's right to a lesser-included offense instruction. *Levine v. United States*, 104 U.S.App.D.C. 281, 282, 261 F.2d 747, 748 (1958). In this case, however, it amounts to the same contention. The case law suggests that the threshold quantity of evidence required before a court must instruct the jury on the defendant's theory of the case is no less than that required for a lesser-included offense instruction. *See Bailey v. District of Columbia, supra; Salley v. United States*, 122 U.S.App.D.C. 359, 353 F.2d 897 (1965); *Levine v. United States, supra.* Appellant's argument therefore fails.

**C. *Constitutionality of Refusal to Give Requested Instructions***

Finally, appellant argues that the trial court committed constitutional error in refusing to give the requested instruction. He notes that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). He then argues, on the basis of *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), that by requiring appellant to produce at least some evidence of no malice (in order to earn the manslaughter instruction) or of mere assault (to qualify for the assault instructions), the burden of proof was shifted—unconstitutionally—to appellant.

**2.** It is interesting to note that defense counsel did not even mention Mr. Clark by name to the jury during closing argument when he advocated the second-beating theory. Instead, he stressed the possibility of a second beating between 9:00 p. m. and 1:00 a. m., the time Mr. Sutton told Officer Condit that he had returned home. Defense counsel's approach to the jury, therefore, reinforces our conclusion that Mr. Clark's testimony did not rise to the level of probative defense evidence, worthy of a lesser-included offense instruction. In contrast to counsel's closing argument, Mr. Clark's testimony that the beating occurred at about 8:00 p. m., whereas all other witnesses had placed the incident at least an hour later, leaves no room for an argument that the two men whom Mr. Clark allegedly saw were the ones who carried out the second beating. If they existed at all, these other attackers reached Mr. Sutton first.

*Mullaney* concerned a Maine statute providing for punishment of all felonious homicide as murder unless the defendant were to prove "by a fair preponderance of the evidence that it was committed in the heat of passion on sudden provocation, in which case it is punished as manslaughter." *Id.* at 692, 95 S.Ct. at 1886. *Mullaney,* however, does not support appellant's position. There, the Supreme Court stressed that "[n]othing in this opinion is intended to affect [the] requirement [of] . . . [m]any states [that] . . . the defendant . . . show that there is 'some evidence' indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt." *Id.* at 701 n.28, 95 S.Ct. at 1891. Thus, the requirement of threshold evidence to justify a lesser-included offense charge (tantamount here to appellant's theory of the case) cannot be held an unconstitutional shift in the burden of proof. The requirement is better characterized as a minimal demonstration by a defendant that a lesser crime than the one charged should be considered—and the government put to its proof.

### III.

■■■ Appellant's second principal ground for reversal is that the 32½-month period between arrest on November 7, 1973, and trial on July 22, 1976, violated his Sixth Amendment right to a speedy trial. A delay of more than one year manifests the "prima facie merit" of a speedy trial claim. *Branch v. United States,* D.C.App., 372 A.2d 998, 1000 (1977); *United States v. Mack,* D.C.App., 298 A.2d 509, 511 (1972); *United States v. Holt,* 145 U.S.App.D.C. 185, 186, 448 F.2d 1108, 1109, *cert. denied,* 404 U.S. 942, 92 S.Ct. 292, 30 L.Ed.2d 257 (1971). In fact, in one instance we have held that a dismissal was warranted for lack of a speedy trial when less than one year had transpired between arrest and trial. *United States v. Young,* D.C.App., 237 A.2d 542 (1968) (7 months). However, there is "no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months." *Barker v. Wingo,* 407 U.S. 514, 523, 92 S.Ct. 2182, 2188, 33 L.Ed.2d 101 (1972). Rather, a court must apply a balancing test weighing not only the length of delay but also "the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. at 2192. *See Branch v. United States, supra; United States v. Calhoun,* D.C.App., 363 A.2d 277 (1976); *United States v. Mack, supra.*

### A. *Length of Delay*

Of the 32½ months between arrest and trial, 18½ were consumed by holding this case in abeyance pending disposition of the government's interlocutory appeal of another case, *United States v. Holmes,* D.C.App., 343 A.2d 272, *rehearing denied,* 346 A.2d 517 (1975). In *Holmes,* the trial court had suppressed the testimony of government witnesses because the government had refused to disclose their names and addresses to defense counsel prior to trial. In the present case, the trial court issued a similar suppression order. The government accordingly filed a notice of appeal to await the outcome of *Holmes,* which presumably would then control the present case. Thus, during the 18½-month period from June 12, 1974, the date when the government filed its notice of appeal to December 31, 1975, when this court granted the government's motion to remand to Superior Court following the *Holmes* decision (upholding the trial judge's discovery order), this case was subject to the appellate process.

Appellant filed his first speedy trial motion on May 6, 1976, which was heard on May 24 and June 1, 1976, and denied on June 22, 1976, immediately prior to trial. In denying the motion, the motions judge held that the 18½-month appeal period was not to be counted—"that the delay with regard to speedy trial as presently conceived by the Courts is a delay in the trial process as distinguished from the appellate process." The judge accordingly based her analysis of the delay on the approximately "one year in time" (November 11, 1973–June 12, 1974; December 31, 1975–June 22,

1976) during which the case had been before the trial court.

In calculating the length of delay, therefore, we must settle the question whether the period of interlocutory appeal by the government "counts." It is true, apropos of the trial court's decision, that Title I of the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161–3174 (Supp. IV. 1974), declares that the delay "resulting from interlocutory appeals . . . shall be excluded in computing the time within which . . . the trial of any . . . offense must commence." 18 U.S.C. § 1361(h)(1)(D). Similarly, the American Bar Association Standards for Criminal Justice, *Speedy Trial*, § 2.3(a) (Approved Draft, 1968), recommends that "interlocutory appeals" be excluded from the calculus. At the heart of the Speedy Trial Act and the ABA Standards, however, is the principle that a defendant must be discharged if not brought to trial within a specified number of days. Such absolute time pressure, leading to dismissal of the indictment if the schedule is violated arguably suggests—and may even require—an exception to the schedule for certain variables not subject to strict control by the trial court managers. However, because the Speedy Trial Act does not apply to cases in the District of Columbia court system, and because we have not adopted the ABA Standards pursuant to our supervisory power over the court system, these legislative and bar-sponsored exclusions are not controlling here. Absent a rigid speedy trial timetable, therefore, we have to examine whether the appeal period provides any inherent reason why it should not be counted as part of the balancing test along with the period of trial court jurisdiction. Under the principles of *Barker v. Wingo, supra*, we find no such reason; we hold that the appeal period should be counted.

In *Barker*, the Supreme Court stressed that "[a] more neutral factor such as . . . overcrowded courts should be weighted less heavily [than a deliberate delay] but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government . . . ."

*Barker v. Wingo, supra*, 407 U.S. at 531, 92 S.Ct. at 2192. Although *Barker* did not specifically consider the period of a pretrial government appeal, this statement, taken at face value, would subject all court congestion, appellate included to the speedy trial countdown against the government. Two months before *Barker*, however, the District of Columbia Circuit Court of Appeals wrote skeptically about the relevance of government appeals to the speedy trial issue. *United States v. Bishton*, 150 U.S. App.D.C. 51, 463 F.2d 887 (1972). Citing the ABA Standards, the court noted:

> [T]he function of appellate courts necessarily casts the delay attendant upon their deliberations in a somewhat different light, and the time spent on appeals is not generally included for purposes of calculating the period of delay in prosecution. The right of the Government to appeal decisions in the defendant's favor before jeopardy attaches is designed to protect the interest of society in lawfully prosecuting criminal offenders . . . . .
> [*Id.* at 54, 463 F.2d at 890 (footnote omitted).]

Three years later, however, the Circuit Court acknowledged that appellate courts should receive no special exemption from speedy trial responsibility. *United States v. Sarvis*, 173 U.S.App.D.C. 228, 523 F.2d 1177 (1975).

> [I]t would be disingenuous to suggest that the entire time during which a case is under advisement is consumed in unraveling complex issues. This court, like the District Court, is not free from the problem of calendar backlog. It is for this reason that appellate delay must ultimately be considered the responsibility of the Government, even though it is a neutral reason not to be accorded the heavy weight assigned to intentional delay. [*Id.* at 234–35, 523 F.2d at 1183–84.]
>
> If trial courts must expedite their procedures under the Sixth Amendment no reason appears why appellate courts should not be subjected to similar constitutional constraints. The time has come to move seriously toward genuine assur-

ance that appeals will be considered expeditiously. [*Id.* at 235, 523 F.2d at 1184.]

These declarations (which happened to occur in a case rejecting an appeal on speedy trial grounds) expressly confirmed what had been implicit in the Circuit Court's reversal of a conviction earlier the same year for lack of a speedy trial: that the time taken for an interlocutory appeal by the government is countable and chargeable to the government. *See United States v. Brown*, 172 U.S.App.D.C. 92, 520 F.2d 1106 (1975) (reversed on basis of four-year period between arrest and trial, including 16-month interlocutory appeal by government). *See United States v. Osuna-Sanchez*, 446 F.2d 566, 567 (9th Cir. 1971) (*per curiam*), *cert. denied*, 404 U.S. 1022, 92 S.Ct. 698, 30 L.Ed.2d 672 (1972); *Waugaman v. United States*, 331 F.2d 189 (5th Cir. 1964) (*dicta*); *Koenig v. Willingham*, 324 F.2d 62 (6th Cir. 1963), *cert. denied*, 376 U.S. 958, 84 S.Ct. 980, 11 L.Ed.2d 976 (1964); *Chism v. Koehler*, 392 F.Supp. 659, 665 (W.D.Mich.1975), *aff'd*, 527 F.2d 612 (6th Cir.), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1686, 48 L.Ed.2d 188 (1976).

We, too, implicitly have included appeal time in the speedy trial calculation. *See United States v. Clark*, D.C.App., 376 A.2d 434 (1977). And, on at least one occasion, a member of the court has expressly alluded to it. *Reed v. United States*, D.C.App., 383 A.2d 316, 323 (1978) (Kelly, J., concurring).

■ It follows, therefore, that in calculating the length of delay the motions judge erred in excluding 18½ months of interlocutory appeal time from the 32½-month period between arrest and trial. Our question at this point, therefore, is whether the relevant length of delay—32½ months—when considered together with the other three factors, denied appellant his Sixth Amendment right as a matter of law. We must keep in mind that "the longer the time between arrest and trial, the heavier the burden of the Government in arguing that the right to a speedy trial has not been abridged." *Hedgepeth v. United States*, 124 U.S.App.D.C. 291, 294, 364 F.2d 684, 687

(1966) (*Hedgepeth I*). *See Branch v. United States, supra.*

B. *Reasons for the Delay*

In analyzing the second factor—the reasons for delay—we can divide this case into three periods: (1) November 7, 1973–June 12, 1974 (date of arrest to date of government's notice of interlocutory appeal); (2) June 12, 1974–December 31, 1975 (period of interlocutory appeal); and (3) December 31, 1975–June 22, 1976 (date of remand from this court to date of trial).

■ The first period of 7½ months covered arrest, presentment, mental examination, preliminary hearing, indictment, arraignment, and the filing and consideration of the court of defense requests for discovery—all "routine, normal delay[s] inherent in judicial procedures," *Bond v. United States*, D.C.App., 233 A.2d 506, 511 (1967), concerning which "no real basis appears . . . for faulting either side." *United States v. Jones*, 154 U.S.App.D.C. 211, 213, 475 F.2d 322, 324 (1972).

> [T]he ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself. [*United States v. Ewell*, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966).]

We do note that the government requested and was granted continuances as to each of the first two trial dates set by the court (April 3 and May 29, 1975). The continuances, however, were as much necessitated by defense discovery requests as by the prosecution's own requirements; and, in any event, there is no indication in the record of a deliberate attempt on the part of either party to delay the progress of the case during this period. We hold, therefore, that under the circumstances of this case, the first period of 7½ months does not provide a basis for appellant's claim that he was denied a speedy trial; none of this time is chargeable specially against the government.

As to the second period, appellant argues that the government's attempt to improve its tactical position by means of an 18½-month interlocutory appeal must be weighted heavily against the government, especially because the *Holmes* appeal (on which the present case was waiting) provided a sufficient vehicle for testing the government's position on discovery of its witnesses.

In *Branch v. United States, supra,* we dismissed the indictment after finding that a 16-month delay between arrest and trial was substantially attributable to the government's tactical effort to postpone trial for burglary and grand larceny in the hope of obtaining a murder indictment as well. The other cases we have found supporting speedy trial dismissal based on government efforts for a tactical advantage concerned delays caused by forum shopping. *United States v. Lara,* 172 U.S.App.D.C. 60, 520 F.2d 460 (1975); *United States v. Burke,* 224 F.Supp. 41 (D.D.C.1963); *United States v. Barnes,* 175 F.Supp. 60 (S.D.Cal. 1959); *Petition of Provoo,* 17 F.R.D. 183 (D.Md.), *aff'd mem.,* 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955). *See Hanrahan v. United States,* 121 U.S.App.D.C. 134, 139, 348 F.2d 363, 368 (1965), *on remand,* 255 F.Supp. 957 (D.D.C.1966), *aff'd,* 126 U.S. App.D.C. 206, 376 F.2d 761, *cert. denied,* 389 U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111 (1967). *But see United States v. Ewell, supra.* In contrast, as our discussion in *United States v. Holmes, supra,* makes clear, the government's appeal against discovery of the names and addresses of its prospective witnesses was not a mere tactical move. It was an honest attempt to obtain a definitive appellate determination of an unsettled question of considerable significance in the law of criminal procedure; it cannot be equated to an attempt by the government to obtain a more favorable fact-finder in a particular case by bringing a charge in a doubtful forum. Nor can we accept the suggestion that because the government already had raised the witness-disclosure issue in *Holmes,* its action in taking an interlocutory appeal in the present case should be viewed as a dilatory tactic. To have

disclosed its witnesses here, while claiming in good faith to base its refusal in *Holmes* on a concern for their safety, would have been inconsistent and illogical.

Although it is clear that "[t]here is no indication the government has attempted to delay the trial to obtain a tactical advantage or to harass or oppress the defense," *United States v. Bolden,* D.C.App., 381 A.2d 624, 628 (1977), this does not end the inquiry. Given the fact that "neutral" factors had already required 7½ months, we must evaluate the reasons why the interlocutory appeal necessitated a full 18½ months, in order to determine whether, absent deliberate attempts to delay, the government nevertheless should be charged with substantial responsibility for failing to provide a speedy trial.

The question is somewhat complicated by the fact that extensions granted for the filing of appellee's brief in *Holmes* totaled approximately 1½ months during the period of appeal in the present case. Thereafter, this court required approximately three months from the date all briefs were filed to schedule oral argument in *Holmes* and approximately 9½ more months from the date of oral argument to issue an opinion— all within the 18½ months that the interlocutory appeal of the present case was pending. In addition, approximately 2½ months were then required for the filing and disposition of the government's unsuccessful petition for rehearing en banc in *Holmes.* Finally, a period of almost two months elapsed between the denial of rehearing in *Holmes* and remand of the present case to the trial court—including a six-week wait for the prosecutor's office to file its remand petition with this court.

Although no deliberate delay is evident, we cannot overlook D.C.Code 1973, § 23–104(e), which provides that "[a]ny [government] appeal taken pursuant to this section either before or during trial shall be expedited." Certainly a pretrial appeal period of 18½ months makes one wonder why the prosecutor did not cite this statute and invoke the expedited appeal procedure for *Holmes* under D.C. App. R. 4(III), especially because he knew that more pending cases

were at issue than *Holmes* itself.[3] We conclude that the government—prosecutor and appellate court—must share responsibility for not expediting the *Holmes* (and thus the present) appeal, as required by statute and facilitated by court rule.

█ With that said, however, we must also stress that the length of the appeal period in *Holmes*—and in this case—did not reflect an intentional repudiation of appellant's rights. Moreover, if we exclude consideration of the statutory requirement to expedite pretrial government appeals, we can say that the total appeal period here, including the time to consider the petition for rehearing en banc, was consistent with the time frame normally to be expected from the appellate process. *See* our Internal Operating Procedures, effective January 1, 1978, Parts VIII and XI.[4] Nevertheless, because the expedited appeal procedure was not invoked, a portion of the 18½-month appeal period presumably was excessive, reflecting an intermediate, "significant" charge against the government between neutral and intentional delay.

3. D.C. App. R. 4(III) provides as follows:
   III. EMERGENCY AND EXPEDITED APPEALS (Including, but not limited to Bail Appeals, § 23–1324; Family Appeals, § 16–2327; Government Appeals from Intra-Trial Orders, § 23–104; Extradition Appeals, § 23–704.)
   (a) Steps to be Taken.
   (1) Counsel for appellant shall file his notice of appeal promptly with the Clerk of the Superior Court and shall advise the clerk of this court in person or by telephone of the forthcoming appeal.
   (2) Counsel for appellant shall designate or advise the Clerk of the Superior Court of the pleadings and documents necessary to be included in the record for use on appeal. The record shall include the notice of appeal and the order appealed from or docket entry with respect thereto if there be no written order.
   (3) Counsel for appellee shall counter-designate or advise the clerk of such additional pleadings and documents he deems necessary for inclusion in the record on appeal.
   (4) The Clerk of the Superior Court shall transmit the record promptly to the clerk of this court.
   (5) Counsel for appellant shall arrange to pay the necessary fees, if required, to the Clerk of the Superior Court and to the clerk of this court.
   (6) Counsel for appellant shall advise the clerk of this court of the telephone number where he may be reached and he shall advise the clerk of the name, address and telephone number of counsel for appellee.
   (7) Counsel for appellant shall submit such motion, memorandum of law, or other documents which he believes to be essential for the court's consideration. Copies of pertinent documents filed in the Superior Court may be attached as exhibits to an appropriate motion or pleading filed with this court.
   (8) Counsel for appellee shall comply with paragraph (7) and he is encouraged to appear in the office of the clerk of this court together with counsel for appellant to enable the clerk to schedule the appeal for a prompt appellate argument if the court deems argument necessary and advisable.
   (9) The clerk shall advise the Chief Judge or appropriate division of this court of the pendency of the emergency or expedited appeal in order that a prompt determination may be made with respect to the scheduling of argument or consideration of the case on the record and pleadings filed by counsel. Amended May 3, 1972.

4. We consider the time periods set forth in our Internal Operating Procedures to be goals, without binding or constitutional significance. Many of our decisions can be expedited much more quickly than our new Procedures suggest, especially Memorandum Opinions and Judgments and opinions not involving special concurrences or dissents. Others, for a variety of reasons including the complexity of the case, require considerably more time.
   Part VIII.I. of our procedures prescribes the following priorities:
   I. Priority in opinion writing shall be in the following order:
   Pretrial bail appeals [D.C.Code 1973, § 23–1324]
   Extradition appeals [D.C.Code 1973, § 23–704(e)]
   Pretrial government appeals [D.C.Code 1973, § 23–104(a)]
   En banc opinions
   En banc concurrences or dissents
   Dissents or concurrences in a division opinion
   Division opinions in criminal cases with precedence given to those cases in which the appellant is incarcerated
   Public Service Commission appeals [D.C. Code 1973, § 43–705]
   Division opinions in civil cases
   Disciplinary cases are to be decided within the time limit specified in Rule XI, Sec. 8 of the Rules Governing the Bar of the District of Columbia.
   It would not be feasible to break down our overall time goals in Parts VIII to reflect these priorities.

It would not be feasible or appropriate to inquire into how much pretrial government appeal time was neutral (*i. e.,* necessary) and how much was excessive. The only practical way to deal with that question in the speedy trial context is to say that pretrial government appeal time, whether short or long, shall as a general rule be considered a significant, rather than neutral, charge against the government unless the prosecutor moves this court to expedite the appeal.[5] If that is done, the government's charge for delay shall be deemed neutral, irrespective of length, since the appellate court itself must be presumed to act as expeditiously as possible given its caseload and established, often conflicting, priorities.

Because the prosecutor did not invoke the expedited appeal procedure in *Holmes* and the present case, we must conclude that the 18½-month appeal period represents a significant charge against the government in the speedy trial calculation.[6]

The third period—6½ months—between remand and trial, can be characterized essentially as a series of bureaucratic shufflings of the case, with accompanying status hearings and continuances, until it was certified on the day of trial to the judge who presided at trial. No more than three or four weeks can be attributed to defendant-appellant, who sought a continuance to undertake investigation based on the government's newly produced witness list. Although this half-year period would not constitute an extraordinary delay in the normal case, the fact that the indictment was already two years old adds increased significance to each missed opportunity to expedite the case. For this reason, at least 5½ months of the post-remand delay must

be counted significantly against the government, which was no less responsible here than during the appeal.

In summary, we conclude that of the 32½ months between arrest and trial, only 8½ —the first 7½ plus one for sundry defense requests after remand—are not countable against the government. Approximately 24 months—two years—must be characterized as significant delay chargeable to the government.

## C. *Assertion of Right to a Speedy Trial*

Having examined the length of delay and the reasons for it, including the two-year portion assignable to the government, we turn to the third factor: the extent of appellant's assertion of his right to a speedy trial. In denying appellant's speedy trial motion, the judge confirmed that "the defendant has, at various stages of this proceeding, asserted his rights to a speedy trial . . . ." The judge also found that on the occasions when appellant asserted his right, "the case has essentially been advanced forward, except for such motions as may have been before the District of Columbia Court of Appeals."

With this said, however, it is also of note that appellant made no effort of record to press the government to take all available measures to expedite the appeals in *Holmes* and the present case. Indeed, he did not file his first speedy trial motion until May 6, 1976. Thus, appellant's interest in the speedy trial issue was concentrated on the six-month period after remand by this court beginning 2½ years after arrest. It is significant here that appellant did not resist—in fact he consented to—the government's motion to hold the case in abeyance pending appellate disposition of *Holmes.*

---

**5.** There can be exceptions to this general proposition; for example, a more serious charge against the government for proved intentional delay, or an offsetting charge against a defendant who receives a continuance of a briefing deadline.

**6.** In *United States v. Young,* D.C.App., 237 A.2d 542, 544 (1968), we noted that "delays, wholly attributable to the Government, were not absolutely necessary and could have been

limited with the exercise of appropriate diligence; and although the delays were not in bad faith, they resulted in a deliberate choice for a prosecutorial advantage and were as oppressive to appellee as if they had been in bad faith." We believe that this analysis is applicable to the present case to the extent that the government—prosecution and appellate court—did not expedite the *Holmes* appeal.

Appellant may have concluded that delay attributable to the *Holmes* appeal was beyond his control, but this is not to say that a defendant who truly wants a speedy trial can be wholly excused for failure to press the government to seek expedition of its pretrial appeal. Even if entitled by statute to an expedited government appeal, a defendant should make that interest known. If we do not hold him responsible for doing so, we will in effect be encouraging him to hold back during the appeal period, take his chances on eventual acquittal in the hope that the government's case will become stale during the hiatus, and then have a second opportunity for dismissal—for lack of a speedy trial. We do not believe that such a tactic should be automatically rewarded.

We believe that if appellant truly had wanted to move the trial ahead, he could have been expected to file the kinds of pleadings necessary to make that point clear, including an appropriate reference to *Holmes*; we cannot assume that his articulation of the speedy trial concern would have been ignored by the government—prosecution or appellate court.

In summary, the record manifests appellant's substantial interest in a dismissal after 2½ years, without expressed interest in actually going to trial. Thus, after evaluating the first three factors, we would characterize this case essentially as one having a two-year delay, significantly attributable to the government, in which neither party showed much of an interest in finding an earlier way to trial. *See United States v. Bolden, supra* at 628.

### D.   *Prejudice from the Delay*

We turn to the final factor: prejudice to appellant from the delay. It is important to note, first, that the Supreme Court has held that dismissal on speedy trial grounds is not contingent upon proof of prejudice from the delay; prejudice is only one of four factors to be considered. *Moore v. Arizona,* 414 U.S. 25, 26, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973). *See United States v. Bolden, supra* at 627–28. Second, we have

held that delay extending beyond a year raises its own presumption of prejudice, *Branch v. United States, supra* at 1000, and that the government accordingly has the burden of showing no prejudice once that presumption has attached. *United States v. Bolden, supra* at 627–28. Finally, we have held that when the government makes such a showing, it is a powerful offset to the government's responsibility for excessive delay. *See United States v. Perkins,* D.C.App., 374 A.2d 882, 885 (1977) (speedy trial dismissal after 49-week delay reversed in the absence of prejudice); *United States v. Calhoun, supra* at 281–82 (speedy trial dismissal after 14½-month delay reversed because appellant did not make timely assertion of right and was not prejudiced).

▆   The case law has not developed to the point where it is clear what burden the government has to overcome a presumption of prejudice from delay of more than a year. No absolute standard, such as a "preponderance" or "beyond a reasonable doubt," has been adopted. Perhaps the best clue to an appropriate answer comes from *United States v. Rucker,* 150 U.S.App.D.C. 314, 464 F.2d 823 (1972), which noted that the greater the delay, the greater the government's burden. In *Rucker,* the Circuit Court stated that the "prima facie merit" of a speedy trial claim covering delay of over one year

> places on the Government the necessity of justification, the burden of which increases with the length of the delay [citing *Hedgepeth I, supra*]. When the delay approaches a year and a half, as in this case, the Government must provide a justification which convincingly outweighs the prejudice which can normally be assumed to have been caused the defendant. [*United States v. Rucker, supra* at 316, 464 F.2d at 825.]

We conclude, on the basis of *Rucker, supra,* that the government's showing with respect to prejudice—given two years of delay significantly attributable to the government—must "convincingly outweigh" the appellant's assertions.

■ We must be clear about another point: the government's case cannot be expected to rise or fall on whether the government can point to independent evidence convincingly dispelling the contention that appellant was prejudiced from the delay. The government is entitled to argue both the objective facts of record and inferences to be drawn from a defendant's failure to assert particular prejudice. Then, the trial court—or, as here, the reviewing court—will evaluate the evidence and arguments proffered by both sides and decide whether the government has carried its burden of persuasion.

■ Finally, before turning to the facts, we wish to make clear that our analysis will not take into account the motions judge's findings on the prejudice question. On June 1, 1976, at a pretrial hearing on the speedy trial motion, defense counsel stated that, according to his investigator, one of the government witnesses, Melvin Clark, whose name had only recently been turned over to the defense, had seen two men (other than appellant) beat and rob Mr. Sutton. Counsel argued that the 2½-year delay precluded an attempt to locate those two men. The motions judge denied the speedy trial motion on June 22, 1976, immediately prior to trial, having responded as follows on June 1 to defense counsel's proffer: "with regard to the witness [Melvin Clark] for whom the Court will issue a [subpoena] forthwith, it is not such as would rise to a prejudice necessitating the dismissal of the indictment."

This pretrial finding was not based on a comprehensive proffer. Nor did it reflect thorough consideration of appellant's fully developed claim of prejudice based on his theory of the case after an interview with Mr. Clark. Thus, we cannot defer in any way to the motions judge's finding of no prejudice. In contrast, a post-trial finding by the trial judge would have provided a more useful perspective and basis for review of record findings as to prejudice.[7] Appellant, however, did not renew his motion after trial.

Neither party has suggested that we remand to the trial court for findings germane to appellant's speedy trial claim. On the basis of the record, we conclude that the facts are sufficiently clear to preclude the need for evaluation by the trial court. Other cases, however, may present circumstances in which a remand would be the prudent course, given the factual determinations inherent in the speedy trial analysis.

■ We turn now to the facts. The Supreme Court has recognized that a defendant has at least three vital interests in a speedy trial: (1) to prevent undue and oppressive incarceration prior to trial, (2) to minimize anxiety and concern accompanying public accusation, and (3) to limit the possibilities that long delay will impair the ability of an accused to defend. *United States v. Ewell, supra*, 383 U.S. at 120, 86 S.Ct. 773 (1965); *accord, Barker v. Wingo, supra*, 407 U.S. at 532–33, 92 S.Ct. 2182. As to the first interest, we note that appellant was imprisoned for other crimes during most of the period between arrest and trial. The fact that this incarceration was due to unrelated criminal convictions, however, does not eliminate the possibility of prejudice from pretrial delay in the present case. Granted,

---

7. Recently, the Supreme Court in *United States v. McDonald*, 435 U.S. 850, 98 S.Ct. 1547, 1551–52, 56 L.Ed.2d 18 (1978), in holding that the pretrial denial of a speedy trial motion is not appealable before trial, made the following observations:

> As is reflected in the decisions of this Court, most speedy trial claims, therefore, are best considered only after the relevant facts have been developed at trial.
>
> \* \* \* \* \* \*
>
> Before trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative. The denial of a pretrial motion to dismiss an indictment on speedy trial grounds does not indicate that a like motion made after trial—when prejudice can be better gauged—would also be denied.
>
> \* \* \* \* \* \*
>
> The essence of a defendant's Sixth Amendment claim in the usual case is that the passage of time has frustrated his ability to establish his innocence of the crime charged. Normally, it is only after trial that that claim may fairly be assessed.

[a]t first blush it might appear that a man already in prison under a lawful sentence is hardly in a position to suffer from "undue and oppressive incarceration prior to trial." But the fact is that delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge. [*Smith v. Hooey*, 393 U.S. 374, 378, 89 S.Ct. 575, 577, 21 L.Ed.2d 607 (1969).]

More particularly, an accused who is already incarcerated can be prejudiced from the delay in trial of newer charges because of the reduced possibility of concurrent sentences in event of conviction, the practice of increasing the punishment for an existing conviction when an additional, untried criminal charge has been lodged, the anxiety caused by still other charges to meet, and the increased difficulty in helping to prepare one's defense from a base in prison. *Id. See United States v. Rucker, supra.*

In the present case, however, appellant does not make a point of prejudice from incarceration. Nor does he stress the second category: anxiety. Appellant has confined his argument to an assertion of prejudice of the third kind—impairment of his ability to defend himself. He contends that the passage of time both hampered the ability of his counsel to cross-examine the government's witnesses and damaged the credibility of his only witness, Melvin Clark, Jr. More specifically, he argues that determination of the exact time at which the assault allegedly committed by appellant took place was crucial to the jury in assessing the plausibility of his theory of the case, *i. e.,* that the decedent had been the victim of two separate, unrelated assaults and that the injuries received in the second of these attacks were ultimately responsible for his death. Appellant's argument is unpersuasive.

Recall that Melvin Clark, Jr., testified that he had seen Mr. Sutton beaten by two men (other than appellant) on a spring or summer day at about 8:00 p. m., whereas the testimony of Mrs. King and her two sons, taken together, indicated that appellant had beaten Mr. Sutton at approximately 9:00 p. m. on November 1, 1973. The testimony of Mr. Pearsall placed the beating at a time after 11:00 p. m. on November 1; and the decedent, Mr. Sutton, told Officer Condit that he had arrived home around 1:00 a. m. Appellant maintains that if the trial had taken place earlier, these witnesses might have given the jury a clearer picture of the exact sequence of events on the evening of November 1, and thereby provided the jury with a sufficient basis on which to receive and consider his theory of the case.

There are several reasons why appellant's point has no force. First, his theory is premised on the lethal impact of a second beating; and yet his witness, Melvin Clark, Jr., placed the two-man beating consistently before 9:00 p. m., the earliest hour to which any of the other witnesses referred. Second, despite a 32½ month delay, the King brothers' testimony at trial did not differ from their testimony before the grand jury three weeks after the crime, except for Maurice King's additional testimony at trial that he had seen a stick in appellant's hand. Third, appellant offers no reason for concluding that the lapse of time was responsible for the outright inconsistency between Melvin Clark's recollection of the time and season and the recollection of all other witnesses. Whereas loss of memory can lead to vagueness in recollection of details, Melvin Clark, Jr. was positive about details totally at odds with the memories of other witnesses. Finally, we cannot accept the argument that more timely discovery of Melvin Clark, Jr., from the government list of witnesses would have given appellant more realistic opportunity to corroborate that testimony by locating other witnesses to a second beating or even determining the actual identity of such other assailants. There is nothing in the record to indicate that Mr. Clark was ever able to give a description of the attack any more precise than he gave on the stand. He testified that "it was getting dark," that there were "really a lot of things going on that night," and that he was unable to

identify the men he saw attacking Mr. Sutton other than to describe them as about six feet tall.

■ Accordingly, appellant proffers "no specific evidence which has actually disappeared or has been lost, no witnesses who are known to have disappeared." *United States v. Ewell, supra,* 383 U.S. at 122, 86 S.Ct. at 777. *See United States v. Toy,* 157 U.S.App.D.C. 152, 154, 482 F.2d 741, 743 (1973). Instead, appellant hypothesizes the existence of evidence which he suggests was never discovered because of the delay in bringing this case to trial. Such argument does not manifest sufficient prejudice to warrant dismissal of an indictment on speedy trial grounds. This case, therefore, is unlike *Branch v. United States, supra,* where dismissal on speedy trial grounds turned in part on the disappearance and failing memory of known witnesses. We find that the government's argument of no prejudice convincingly outweighs appellant's assertions to the contrary. We find no reasonable possibility of prejudice to appellant's defense preparation from the substantial delay. *Barker v. Wingo, supra; Hedgepeth v. United States,* 125 U.S.App. D.C. 19, 365 F.2d 952 (1966) (*Hedgepeth II*).

E. *Conclusion*

■ We hold, after applying the *Barker v. Wingo, supra,* analysis, that appellant was not denied his Sixth Amendment right to a speedy trial. We have concluded in Part II, *supra,* that there was not " 'any evidence' . . . however weak" that would have justified a lesser-included offense instruction based on appellant's theory of the case that a second, later beating had taken place. Despite the 32½ months between arrest and trial, of which approximately two years amounted to delay attributable to the government, there is no reasonable possibility that evidence to support appellant's theory would have surfaced if the trial had been held earlier.

If any concrete prejudice to defense preparation (or any other type of prejudice) had been brought to light, or if appellant had pressed hard for expedited resolution of the government's pretrial appeal (including *Holmes*), this two-year delay, amounting to a significant charge against the government, might well have been enough to require dismissal on Sixth Amendment grounds. We conclude, however, that a speedy trial claim cannot prevail when the only basis for it is a two-year delay attributable to the government's failure to expedite a pretrial appeal and the subsequent proceedings on remand. Were we to hold otherwise, this case would stand for the proposition that significant delay alone, chargeable to the government but not the result of a deliberate effort to obtain a tactical advantage, violates a defendant's constitutional right to a speedy trial. That is not the law.

*Affirmed.*