**UNITED STATES of America**

v.

**James JONES, Jr., Appellant.**

**No. 73–2102.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 3, 1975.

Decided Aug. 8, 1975.

Fred Warren Bennett, Washington, D. C. (appointed by this court), for appellant.

Jeffrey T. Demerath, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Robert S. Tignor, Asst. U. S. Attys., were on the brief, for appellee.

Before RICHARD T. RIVES,* *Senior Circuit Judge for the Fifth Circuit,* and WRIGHT and McGOWAN, *Circuit Judges.*

McGOWAN, *Circuit Judge:*

Appellant stands convicted of armed robbery, 22 D.C.Code §§ 2901, 3202, and assault with a deadly weapon, 22 D.C. Code § 502. In his initial brief, appellant challenged those convictions on the grounds that (1) they are based on identification evidence derived from an improperly suggestive confrontation at the scene of the crime, (2) they are in any case based on insufficient evidence, and (3) they follow upon a prejudicial error by the district judge in giving a supplemental instruction to the jury while appellant was absent from the courtroom. In the course of oral argument, a fourth issue was identified by the court, as to which counsel was permitted to file a supplemental memorandum. That had to do with the question, then pending before the court en *banc,* of the applicability of 14 D.C.Code § 305, mandating impeachment by prior conviction, to trials of D.C.Code offenses in the District Court. Finding no merit in any of these matters, we affirm.

I

At approximately noon on March 3, 1972, an armed robbery occurred at the Home Federal Savings and Loan Association at Georgia and Alaska Avenues, N. W., Washington, D. C. According to one of the bank's tellers, a Mrs. Waugh, the robbery was committed by four Negro males whose faces were hidden by ski masks. She and the other occupants of the bank were forced to lie face down on the floor while the robbery was in progress. They thus had little or no opportunity to observe the intruders, and did not subsequently identify appellant as one of them.

At the time of the robbery a special police officer by the name of Mr. Furr was working in a liquor store directly adjacent to the bank. He was alerted by a customer that the robbery was in progress. Gun in hand, he left the store and approached the entrance of the bank. He saw two men outside the bank and two other men in its doorway. When he saw that one of them was also armed, he jumped back. There was an exchange of shots, in which Furr was wounded in the arm. Running back through the liquor store and out its back door, Furr caught sight of one of the robbers escaping down an alley which led from Kalmia Street (behind the bank) to Juniper Street. He later found a gun, a mask, and gloves in that alley. However, he did not positively identify appellant as one of the four men he had seen.

Chris Jackson, a 15-year old student, was sitting in his house on Kalmia Street, when he heard the gunfire. Rushing to the window at the back of his house, he observed four men running down the same alley that Furr had seen one of the robbers enter. He saw only the legs of the first man. The second and third carried what appeared to him to be money bags, from which bills were falling as the men ran. The fourth man wore a white trench coat and carried a gun. Police later found a number of bills at the spot Jackson directed them to. Jackson also was unable later to

* Sitting by designation pursuant to Title 28, U.S.Code § 294(d).

identify appellant as one of the men in the alley.

The one witness who did positively identify appellant, and around whom most of this controversy revolves, was Lucille Berg. As the robbery was taking place, she and a friend, Miriam Shuman, were on their way by car to lunch at Hofberg's Restaurant, located at Georgia and Alaska Avenues across from the bank. As she turned the car onto Kalmia Street, Mrs. Berg heard a gunshot, slowed the car, and looked over her shoulder out the rear window. She saw a man kneeling with a gun in his hand. This, it was later established, was Furr. She also saw two other men run from the direction of the bank and across Kalmia Street behind her. A few seconds later two more men ran across the street. One of the second pair was dressed in a white trench coat and carried a gun in one hand and what looked like a money sack in the other. Having crossed Kalmia Street, all four men turned down an alley on the other side.

Mrs. Berg was familiar with the area and knew where the alley came out on Juniper Street. She drove around the block onto that street and there saw the four men get into two cars, a green Volkswagen and a red car that she described to police as "foreign . . . with a slant back." The man in the white trench coat was standing by the right front fender of the red car. Mrs. Berg observed his face, which by this time was unmasked, as close as 10–15 feet. She noted that he wore a beard or goatee and a short bush haircut.

On their way back to the bank, where the two women intended to report their observations to the police, the red car pulled up behind them at a stop sign. Mrs. Berg noted the numbers 868 on the car's license plate. She also observed that the car turned right from the stop sign onto Alaska Avenue and headed toward 16th Street. All this she and Mrs. Shuman (who corroborated her testimony throughout) reported to the police and F.B.I. agents at the bank.

At 12:05 P.M. Officers Acton and Sweeney of the Metropolitan Police Department were cruising in the 3600 block of 16th Street, N.W. They received a radio lookout for two automobiles, a green VW and a second car, red in color with a "swooped type roof" and a license plate which bore the numbers 868. As they approached 16th Street and Colorado Avenue, they saw a green VW turn west onto Colorado Avenue. They then saw a red Pinto travelling south on 16th Street at an excessive rate of speed. The numbers 868 appeared on its license plate. Before they could reach the speeding car it was stopped by another officer, one Logan, driving a separate scout car. The Pinto's two occupants, one Gary Frazier, who was at the wheel, and appellant, who was in the passenger seat, were placed under arrest. Neither of the occupants wore a white trench coat, and nothing of an incriminating kind was found in the car. The suspects were taken first to the 10th Precinct for initial questioning and then to the bank where the robbery had taken place, arriving there about forty minutes after the arrest was made on 16th Street. Appellant was transported by the police. Frazier, at his own request and accompanied by Officer Acton, was permitted to drive the Pinto, first to the Precinct and then to the bank, where he parked it a short distance away.

Mrs. Berg and Mrs. Shuman had by this time belatedly settled in to lunch at Hofberg's. F.B.I. Agent Buscher, to whom they had first given their account of the fleeing robbers, now interrupted them to ask if they would return to the bank to "try to identify some suspects." They were apparently also told that a car had been taken into custody. On their way back to the bank, Mrs. Berg saw the parked Pinto and remarked (apparently spontaneously) that this was the same car in which she had seen the robbers escaping. Upon returning to the bank, Mrs. Berg and Mrs. Shuman were kept apart from the others present and were taken to the rear of the bank. The two suspects were brought into their view. In Mrs. Berg's words, "[t]hey

were just standing and talking in the vice-president's area or the manager's area and we stood back and looked at them, one at a time." Tr. 74. Mrs. Berg positively identified the appellant as the man who had been wearing the white trench coat. She was unable to identify the second man, but insisted that she knew appellant by his face. Mrs. Shuman also identified appellant, but on a more tentative, "look-alike" basis.

These identifications of appellant in the bank were testified to at trial by Mrs. Berg and Mrs. Shuman themselves, and also by F.B.I. Agent Buscher. Mrs. Berg made an in-court identification as well. It is this in-court identification and testimony as to on-the-scene identifications that appellant sought unsuccessfully to suppress.

## II

Appellant's suppression claim is based on the presence of the red Pinto outside the bank. Assertedly, this circumstance was "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed. 1199 (1967). If that were so, evidence of the identifications made in the bank would be inadmissible, and a hearing would be required to determine whether even the *in-court* identifications by the two women could be admitted as having an independent source. *Clemons v. United States,* 133 U.S.App.D.C. 27, 408 F.2d 1230, 1237 (1968) (*en banc*), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). But we see no due process violation in the confrontations that took place.

This court has a number of times applied the principles of *Stovall* and *Clemons* to so-called "show-ups" of the suspects of a crime near the place and time of its commission. Following the command of those cases that we look to the totality of circumstances which may justify or condemn such witness confrontations, we have held that on-the-scene confrontations are to be permitted "ab-

sent special elements of unfairness." *Russell v. United States,* 133 U.S.App. D.C. 77, 408 F.2d 1280, 1284 (1969), *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969); *United States v. Perry,* 145 U.S.App.D.C. 364, 449 F.2d 1026, 1038 (1971); *United States v. Hines,* 145 U.S.App.D.C. 249, 455 F.2d 1317, 1328 (1971), *cert. denied,* 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972).

■ Undoubtedly, there was a degree of suggestiveness present in the confrontation in this case. Although there is contradictory testimony on the point, it appears that Mrs. Berg and Mrs. Shuman were in effect informed, when they were summoned from Hofberg's Restaurant, that the suspects had been seized in a car meeting the description they had given. They certainly knew that the suspects had been seized in the car parked outside the bank. The classic dangers of misidentification in on-the-scene witness confrontations were present, not the least of them the pressure on Mrs. Berg and Mrs. Shuman to prove their information accurate and thereby justify the actions taken by the police in reliance on it.

But we have not permitted speedy, on-the-scene witness confrontations because they were not suggestive. On the contrary, we have recognized from the beginning that "confrontations in which a single suspect is viewed in the custody of the police are *highly* suggestive." *Russell v. United States, supra,* 408 F.2d at 1284 (emphasis added). We have permitted them nonetheless because we have considered their dangers to be surpassed by their value in terms of the greater accuracy of witnesses' recollections when they are fresh and in terms of the benefit to society and suspects alike from having crimes quickly resolved. Appellant has shown us no "special element of unfairness" that would upset that calculation in this case.

We do not think the presence of the car necessitates reversal. After all, a suspect is likely to be found with *some* incriminating article—typically clothing—or he would not be a suspect. In

other respects the confrontation was carefully conducted and, indeed, seems less objectionable than others that have passed muster. Appellant was not wearing handcuffs; nor was he behind bars or subject to any other suggestive restraint. *Compare Russell v. United States, supra.* He was not clothed in the way that the witnesses had seen the robbers earlier. The identifications seem generally reliable, Mrs. Berg's in particular. She had seen appellant several times, from as close as ten feet, from the relative safety of her car, and with the specific purpose of later identifying him. She recognized him by his face, rather than by his general appearance or build. She had accurately described his beard and haircut, as well as the license plate numbers on the car he was riding in, before she ever saw him or his car back at the bank. Appellant's case for misidentification is thus not a strong one.

Some discussion is merited of an aspect of the *Stovall* case which has not loomed large in our previous "show-up" cases, but which appellant brings to our attention in this one. *Stovall* condemned confrontations that were "*unnecessarily* suggestive," thus implying a duty on the part of the police to minimize suggestiveness, and a duty on the part of the courts to exclude evidence derived from a witness confrontation, even if we think it on the whole a reliable one, if it could have been *more* reliable. *See also Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (declining to apply this aspect of Stovall retroactively). Appellant's argument is that it was unnecessary to have the red Pinto parked outside the bank.

The car was not where it was, however, at the insistence of the police, but at the request of appellant's companion, Frazier. There is no suggestion that the police deliberately planned to place the car where it could serve a suggestive purpose. To be sure, the police could have prevented Frazier from parking where he did, but in doing so would have shown extraordinary presence of mind and attentiveness to an interest of the

suspects which even the latter themselves did not perceive. We could not require the police to take such scrupulous care, all the while urging them to act quickly, unless their failure to do so resulted in extreme prejudice, which, as we have said, it did not in this case.

### III

Appellant's second challenge is to the trial judge's failure to acquit him on the ground of insufficient evidence. He argues the point separately with respect to his two convictions.

As to the first, that for armed robbery, he concedes that the evidence was sufficient to prove that he was the man whom Mrs. Berg and Mrs. Shuman (and also Jackson) saw fleeing the scene of the robbery in a white trench coat. What he denies is that the evidence showed that that man was also among those who took part in the robbery.

It is true that neither Waugh, who was inside the bank, nor Furr, who was just outside it, testified to their having seen a man in a white trench coat. Jackson saw the man some time later, and Mrs. Berg and Mrs. Shuman could only say that they had seen him come from the direction of the bank. Waugh was face down on the floor, however, and Furr was being shot at, so that their failure to recall seeing such a man in or coming out of the bank is certainly not inconsistent with there having been one.

Waugh and Furr were each sure that they saw four men. Mrs. Berg and Mrs. Shuman also saw four men, one of them in a white trench coat, and this must have been only moments later. It strains credulity to suggest, as appellant does, that these were not the same four men. The jury was certainly free to reject the suggestion, especially in the absence of any explanation of where, in those few moments, any of the first four men could have gone to, or their replacements come from.

As for appellant's other conviction, if the evidence was sufficient for the jury to conclude that appellant was among

those who entered and robbed the bank, it was also sufficient to support appellant's conviction for the deadly weapon assault upon Furr. Appellant's contention is that "there was no evidence appellant fired the pistol at Lewis Furr." In fact the man in the white trench coat was the only one whom the witnesses recalled as having a gun. But the jurors need not have so found. They were properly instructed that aiding and abetting the assault would make appellant liable as a principal, and their conclusion that he was among the bank robbers was itself sufficient to establish that he did aid and abet the assault.

■ It is the settled rule that one who commits a crime is also guilty as an accessory of any other crimes occurring as the "natural and probable consequences" of the crime he himself commits. *See, e. g., United States v. Clayborne,* 166 U.S. App.D.C. 140, 509 F.2d 473 (1974); *In re Reeder,* 264 A.2d 893 (D.C.App.1970); *W. Clark & W. Marshall, Law of Crimes,* 529 (7th Ed. 1967). If there is a more natural and probable consequence of armed robbery than that the arms will be used and someone injured, we do not know what it is. Since he carried a gun, even if he did not use it, appellant is not in a strong position to raise the primary objection to the "natural and probable consequences" rule—that it imputes guilt for a crime for which the necessary mental state may be lacking. *Cf. United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.) (accomplice liability has "nothing whatever to do with the probability that the forbidden result will follow upon the accessory's conduct"); *W. LaFave & A. Scott, Handbook on Criminal Law* 515–17 (1972) (disapproving the rule as "inconsistent with our more fundamental principles of criminal law").

## IV

Appellant's third challenge is based on the trial judge's having given the jury, under the circumstances now to be described, a supplemental instruction while appellant was absent from the courtroom. During the trial the district judge repeatedly advised appellant of his right to be present during all proceedings. He also informed appellant that his unexplained absence from the courtroom at any time would be taken as a waiver of that right. After the jury retired, the judge repeated these points to appellant, specifically warning him that the jury might ask for additional instructions, and that appellant should be present if they did. Court was then recessed. This was at 5:28 P.M.

At 5:31 P.M. court was reconvened upon receipt from the jury of a request for additional instructions. Though they had previously been instructed that the principle of aiding and abetting applied "in this case," the jurors were unsure whether it applied to both the assault count and the armed robbery count, or only to the former. The judge decided to grant the request, but appellant was nowhere to be found. With the consent of appellant's counsel, the judge did not wait, but gave the following supplemental instruction in appellant's absence:

> The jury may recall that at the time that I instructed you, I indicated to you and stated that there was a principle of law known as aiding and abetting that is applicable to this case, and since it is applicable to this case, it is applicable to each count of the case.

Tr. II 296–297. Appellant reappeared in the courtroom a short time later and, learning what had transpired, offered no objection.

His claim now is that he had not validly waived his right to be present, at least not until the judge had waited a "reasonable" time for him to return. Though appellant casts his claim in constitutional terms, *see Hopt v. People of Territory of Utah,* 110 U.S. 574, 578, 4 S.Ct. 202, 28 L.Ed. 262 (1884); *Lewis v. United States,* 146 U.S. 370, 372, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), he might also have argued that he was not "voluntarily absent" in the manner required by *Fed.R.App.P.* 43.

■ However the claim is styled, we see no need to pass on its merits, since,

even if error occurred, it clearly was harmless. *Walker v. United States,* 116 U.S.App.D.C. 221, 322 F.2d 434 (1963). *Cf. United States v. Neil,* 320 F.2d 533 (3d Cir. 1963) (prejudice to defendant from his absence during charge to jury not necessary). We can see nothing even faintly objectionable in the instruction in question. Appellant urges in his brief that it "may have highlighted" the aiding and abetting principle, but the problem was obviously already "highlighted" for the jurors by their own confusion, which the judge only acted to dispel. The supplemental instruction really was nothing more than a clarified restatement of the original aiding and abetting instruction. For a case holding that just such a clarification of an aiding and abetting instruction may harmlessly, if erroneously, be made out of the presence of the defendant, see *United States v. Arriagada,* 451 F.2d 487 (4th Cir. 1971).

■ As for argument that the jury may have "speculated adversely to the [appellant] about his absence from the courtroom," we need only say that, standing alone, it does not establish the necessary "reasonable possibility of prejudice." *Walker v. United States, supra* 322 F.2d at 435. *Cf. Wade v. United States,* 142 U.S.App.D.C. 356, 441 F.2d 1046, 1050 (1971).

V

■ Presumably acting by reference to 14 D.C.Code § 305, the trial court instructed appellant that he would expose himself to impeachment by a prior conviction for armed robbery if he decided to take the stand in his own defense; and at least partly for that reason appellant elected not to testify. When, during oral argument of this appeal, the court noted that the applicability of Section 305 to trials of D.C.Code crimes in the District Court was pending before the court *en banc,* appellant sought and was granted leave to raise the issue by supplemental memorandum. We there-

after deferred disposition of this case pending the *en banc* decision.

That decision was forthcoming on June 16, 1975, in the opinion governing the group of four appeals consolidated for *en banc* consideration known as *United States v. Belt,* 169 U.S.App.D.C. ——, 514 F.2d 837 (1975). Three of those appeals involved trials only of D.C.Code crimes, and it was held in respect of them that the D.C. impeachment statute applied. *Belt* itself involved a trial of one U.S.Code and one D.C.Code offense combined in the same indictment, in which trial impeachment was permitted by reference to Section 305. Because the jury acquitted of the federal offense, and convicted only of the local, it was argued that application of the statute was not error requiring remand for consideration of the admissibility of the prior conviction under the discretionary rule. We held that the defendant was entitled to a trial free of the statute, and that a remand was necessary. In reaching this result, the court *en banc* explicitly adopted the approach of the division in *United States v. Hairston,* 161 U.S.App.D.C. 466, 495 F.2d 1046, 1054 note 13 (1974), where it was said:

> To the extent that confusion in the conduct of trials may be anticipated in those cases where the United States Attorney uses the authority given him under the reorganization statute to combine local and federal crimes in the same indictment, resulting in their trial together in the United States District Court, it would appear that the federal forum's evidentiary law would govern impeachment by prior conviction. The United States Attorney is not, of course, bound under the statute to combine local and federal charges, and is, accordingly, under no inescapable necessity to try local crimes under other than local law.

The indictment in the case before us as originally returned included, in addition to the D.C.Code offenses of which appellant was eventually convicted, two counts under the U.S.Code for robbery

of a federally-insured savings and loan association (18 U.S.C. § 2113(a)). These two counts were, however, dismissed by the Government, with the court's permission, at a pretrial hearing. The trial itself was, accordingly, confined to the D.C.Code offenses, of which the District Court at that time had exclusive jurisdiction since the indictment was returned during the eighteen-month transitional period (February 1, 1971 to August 1, 1972) established by 11 D.C.Code § 502(2).

Appellant now argues that, because the indictment in this case as originally returned contained both U. S. and D. C. offenses, *Belt* requires that there be a remand to the District Court with directions to reexamine the question of appellant's amenability to impeachment by prior conviction in the light of the discretion then available to it under the *Luck-Gordon* rule (which has been superseded as of July 1, 1975 by the Federal Rules of Evidence).

*Belt* does not extend so far. We held there that, where a defendant is actually tried simultaneously for both federal and local offenses, it is feasible for that trial to be held only by reference to one set of evidentiary principles, and that the governing evidentiary law would be federal. There was no *trial* here of federal and local offenses at the same time. The indictment as returned, it is true, included both, but the former disappeared before trial. We find no merit, therefore, in appellant's post-*Belt* contention.

*Affirmed.*