Tony TURNER, a/k/a Devon
Turner, Appellant,

v.

UNITED STATES, Appellee.

No. 86–CF–750.

District of Columbia Court of Appeals.

Argued Dec. 16, 1992.
Decided March 23, 1993.

Gary T. Brown, Washington, DC, appointed by this court, for appellant.

Kenneth C. Kohl, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and J. Edward Agee, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, and KING and SULLIVAN, Associate Judges.

ROGERS, Chief Judge:

Appellant Tony Turner appeals his convictions of first degree theft, D.C.Code §§ 22–3811, –3812(a) (1989 Repl.), and second degree burglary, *id.* § 22–1801(b), on the grounds that the trial judge erred in denying his motion to suppress identification testimony and by failing to dismiss the indictment because appellant's Sixth Amendment right to a speedy trial had been violated. We affirm.

## I.

Appellant filed a pretrial motion to suppress identification testimony on the ground that in the absence of a positive identification based on the recognition of facial features, the identification based on non-distinctive clothing was too speculative, and that in view of the inherent suggestivity in a show-up identification, an identification based on "a match-up of commonplace clothing" was insufficiently reliable.

At the hearing on the motion, Michael Angel testified that on January 23, 1984, at approximately 5:40 p.m., he entered his home at 1418 C Street, S.E. and saw someone climbing on the bars of the rear kitchen window. It was dusk—not dark enough to require headlights when driving—and Mr. Angel could see without the lights on.

Mr. Angel went to the rear kitchen door and looked out, through a window in the door, at the person on the kitchen window, who was only about fifteen feet away from him.

The man's back was to Mr. Angel. The man had a brown skull cap, light blue pants, dark brown boots and a beige waist-length jacket. Mr. Angel could also see the man's neck and hair, and could tell that the man was "light-skinned." He estimated that the man was five feet eleven inches or six feet tall, and thought the climber was in his early twenties given his slender build, hair style, and type of clothing. Mr. Angel continued to look at the man for approximately one or two minutes, until he determined that he did not know the man on the window, and then went to a neighbor's house to call the police. When the police arrived approximately fifteen minutes later, Mr. Angel told them what had happened. About ten minutes later, the police told him that they had a suspect for him to view, and brought Mr. Angel outside, in front of his house. He saw appellant standing near a police car, where there were street lights; two police officers were also there. Mr. Angel did not think appellant was handcuffed. Appellant turned around so Mr. Angel, who was standing about five feet away, could see him from all sides. The identification took less than a minute.

The trial judge denied the motion, crediting Mr. Angel's testimony and finding no suggestivity in the show-up beyond that suggestivity that inheres in every show-up identification. The judge also examined the reliability of the identification, using the factors set forth in *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), and *Manson v. Brathwaite,* 432 U.S. 98, 114–16, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1977), finding that Mr. Angel's observation was made quickly, from a distance of fifteen feet, at dusk, with "sufficient time" to observe, even though he did not see appellant's face, and that Mr. Angel gave 100 percent of his attention to the man on the bars. Noting that there was no evidence concerning the accuracy of Mr.

Angel's description to the police, and that the witness had not been asked how certain he was of the identification, the judge found that the identification took place approximately thirty minutes after the first observation, and there was no evidence that Mr. Angel had failed to identify appellant on any other occasion. Accordingly, the judge concluded that there was sufficient evidence of the identification's reliability and hence no Fifth Amendment ground existed for prohibiting the government from using the identification evidence.

At trial, Mr. Angel's testimony was substantially the same as his suppression testimony, although he indicated explicitly that he had told the police at the time of the show-up that appellant was the man he had seen outside of this kitchen window; he was "positive." He recognized the man's clothes—the jacket, pants, boots and cap—and noted that his complexion, height and build were "very similar."[1]

Several police officers also testified at trial. Officer Somach testified that when he received a call about the burglary, it was dusk and the caller had said that the suspect was wearing dark blue pants. According to the officer, appellant "matched the description as far as clothing wise," in that appellant had on darkish brown boots and blue pants, and appellant alone was seen in the alley behind Mr. Angel's home. When appellant saw the police car, he made a 180-degree turn and began walking in the other direction. The officer stopped appellant, and another officer took appellant to the police car. There were footsteps in the snow which matched appellant's bootprints and led down the alley to a trash can or dumpster, inside of which there were two television sets; the footprints went from the dumpster to the rear

yard of Mr. Angel's house. Officer Carter's testimony was similar, but he admitted that no scientific comparison had been made between appellant's boots and the prints to the dumpster. Officer Randall referred to a red stain on appellant's jacket and the fact that Mr. Angel's house was made of red brick, which looked as if it had been painted. He had first seen appellant about fifty to sixty feet from Mr. Angel's home.

In denying appellant's motion for a judgment of acquittal on the grounds of insufficient identification and insufficient evidence that the person on the bars had committed a crime, the trial judge observed that:

> [t]he fact that somebody wears commonplace clothing isn't dispositive of the matter. The statistical odds of a person wearing boots that ... appear to be the same, a hat that appears to be the same, pants that appear to be the same, and a jacket that appears to be the same within 100 feet, within 10 to 15 minutes is remote.

Furthermore, the judge noted, there was additional circumstantial evidence corroborating the identification of appellant in that he was found in back of Mr. Angel's house.[2]

On appeal appellant contends that the trial judge erred in denying the motion to suppress Mr. Angel's out-of-court identification of appellant under *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1966). He maintains that the fact that Mr. Angel made a one-person show-up identification at a time when it was approaching dark, saw only the person's back at the time of the initial observation, and was upset at the time he called the police makes clear, from the totality of circumstances,

---

1. Mr. Angel also testified that he had heard noises upstairs in his house when the person was standing on the kitchen window bars. He also discovered that two television sets were missing from his house.

2. Appellant presented four witnesses in support of an alibi-misidentification defense. The first witness testified that appellant was at a friend's house until at least 5:15 p.m. The second witness testified that appellant had been visiting his

house until around 5:35 p.m. The third witness testified that he saw appellant enter the alley at 5:15 or 5:45, followed within three or four minutes by a police car. He stated that he left appellant in the alley at 5:50. Finally, a fourth witness testified that appellant had a cast on his hand the day before the burglary, and a week later was still complaining about his hand "hurting. He was unable to lift things."

that the identification was unreliable. Appellant further contends that because the government's entire case rests on the identification, the case should be dismissed for insufficiency of the evidence.

The trial judge addressed the factors under *Neil v. Biggers, supra,* 409 U.S. at 197–98, 93 S.Ct. at 381, *see Henderson v. United States,* 527 A.2d 1262, 1269 (D.C. 1987), and we find no error.[3] Out-of-court identifications and testimony concerning them are examined under a familiar two-part inquiry.[4] This court has repeatedly held that the appearance that the suspect is in custody does not necessarily make an identification so suggestive as to create substantial likelihood of misidentification where the show-up takes place at the scene of the crime within a short period of time after the incident. *See e.g., Garris, supra,* 559 A.2d at 327 (citations omitted). Suggestiveness arising from the fact that appellant was standing next to the police car and police officers, and was obviously in custody, is the only basis for appellant's claim of substantial likelihood of misidentification: appellant was neither handcuffed nor standing next to the stolen televisions, nor were there any other suggestive factors. There was no more pressure on Mr. Angel to identify appellant than would have been present in any show-up. *Cf. Parks v. United States,* 451 A.2d 591, 605 (D.C.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983).

While a show-up may not be an ideal setting for an identification, it is not sufficient alone to establish a due process violation.[5] *Manson v. Brathwaite, supra,* 432 U.S. at 106, 97 S.Ct. at 2249 (citation omitted). Indeed, identifications conducted soon after the crime enhance the accuracy of witnesses' identifications and allow innocent suspects to be quickly freed. *See Russell, supra,* 133 U.S.App.D.C. at 81, 408 F.2d at 1284; *United States v. (James) Jones,* 170 U.S.App.D.C. 362, 365, 517 F.2d 176, 179 (1975). Appellant has failed to point to any "special elements of unfairness." *Russell, supra,* 133 U.S.App.D.C. at 84, 408 F.2d at 1284. *See also Jones, supra,* 170 U.S.App.D.C. at 365, 517 F.2d at 179.

Furthermore, assuming the show-up had created substantial likelihood of misidentification, the trial judge could properly conclude that identification was still reliable and therefore admissible. *See Neil v. Biggers, supra,* 409 U.S. at 199, 93 S.Ct. at 382.[6] Mr. Angel observed appellant on his window for approximately a minute. His attention was focused on the intruder on his window bars: he was checking to see whether he knew appellant. He examined appellant closely enough to determine that the intruder was not anyone he recognized. Mr. Angel called the police with a description only minutes after he observed the man on his window, and identified appellant about thirty-five minutes after those

3. This court is bound by the trial court's findings on whether identification procedures were impermissibly suggestive and whether an identification was reliable "if they are supported by the evidence and in accordance with law." *Stewart v. United States,* 490 A.2d 619, 623 (D.C. 1985) (citation omitted). *See also Garris v. United States,* 559 A.2d 323, 327 (D.C.1989) ("supported by the record").

4. The first inquiry is whether the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification," and if so, the second inquiry is whether the identification is nonetheless sufficiently reliable. *Neil v. Biggers, supra,* 409 U.S. at 198–99, 93 S.Ct. at 382 (citations omitted). *See also Matter of B.E.W.,* 537 A.2d 206, 207 (D.C.1988) ("unnecessarily suggestive and conducive to the substantial likelihood of irrepara-

ble misidentification") (quoting *Singletary v. United States,* 383 A.2d 1064, 1068 (D.C.1978)).

5. *See Matter of B.E.W., supra,* 537 A.2d at 207; *Russell v. United States,* 133 U.S.App.D.C. 77, 81, 408 F.2d 1280, 1284 (1969); *cf. Hollingsworth v. United States,* 531 A.2d 973, 977 (D.C.1987).

6. Reliability is examined by considering factors including:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* 409 U.S. at 199–200, 93 S.Ct. at 382. *See also Manson v. Brathwaite, supra,* 432 U.S. at 114–16, 97 S.Ct. at 2553–54.

observations.[7] He was certain of his identification. Mr. Angel was never asked to identify appellant at a line-up, and hence there is no evidence that he ever failed to identify appellant.

■ The fact that Mr. Angel did not see appellant's face is not dispositive. As the court stated in *Nichols, supra,* 343 A.2d at 344, an on-the-scene identification may be appropriate where a witness has sufficient opportunity "to observe the figure of a person ... and has a vivid impression of such characteristics as height, build, race, hair style, and clothing." *Cf. Garris, supra,* 559 A.2d at 328. Mr. Angel, who was only about fifteen feet from the intruder standing on the window bars, observed him closely enough to determine that person was not anyone he recognized, and specifically noted the person's clothing, build, height, hair and skin color. Appellant's suggestion that Mr. Angel was merely identifying appellant on the basis of common, nondescript clothing is unsupported by the record. Nothing suggests that Mr. Angel equivocated in any way in concluding that the build, complexion, and clothes of appellant matched those of the intruder. Mr. Angel's description of appellant's clothing was essentially accurate, and any difference between his view of the color of appellant's pants as light blue and the officer's view that they were dark blue was a matter for the jury to weigh. *See Manson, supra,* 432 U.S. at 115–16, 97 S.Ct. at 2254; *(James) Jones, supra,* 170 U.S.App.D.C. at 366, 517 F.2d at 180; *cf. Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991).

■ Accordingly, we find no merit to appellant's contention that "[b]ecause the prosecution's entire case rested on this initial show-up identification, its constitutional infirmity requires dismissal for insufficiency of other evidence." Even if the identification had been flawed, there was other sufficient evidence pointing to appellant as the person who had been climbing on Mr. Angel's window. *Cf. Manson, supra,* 432 U.S. at 116, 97 S.Ct. at 2254. An officer saw appellant in the alley behind Mr. Angel's house wearing clothing that matched Mr. Angel's description fifteen minutes after Mr. Angel had called the police. An officer followed the distinctive footprints left in the snow by appellant's boots to the site of two televisions stolen from Mr. Angel's house. A red stain on appellant's jacket matched the color on the surface of Mr. Angel's house.

## II.

■ Appellant also contends that his Sixth Amendment right to a speedy trial was violated because of nearly twenty-four months of delay between his arrest and trial. Upon examining the four factors set forth in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), based on the analysis adopted in *Graves v. United States,* 490 A.2d 1086, 1091 (D.C.1984) (en banc) (citations omitted), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986), we find no violation.[8]

## A.

Appellant was arrested on January 23, 1984. A probable cause hearing was held

---

**7.** *See Manson v. Brathwaite, supra,* 432 U.S. at 116, 97 S.Ct. at 2254; *Matter of B.E.W., supra,* 537 A.2d at 208 (identification within a few minutes); *United States v. Brannon,* 404 A.2d 926, 927, 928 (D.C.1979) (show-up twenty to forty-five minutes after robbery); *Garris, supra,* 559 A.2d at 326–27 (identification of one suspect forty-five minutes after second robbery and one day after first robbery, identification of second suspect one day after first robbery) (citing cases); *Nichols v. U.S.,* 343 A.2d 336, 345 (D.C. 1975) (twenty to twenty-five minutes); *cf. Stovall v. Denno, supra,* 388 U.S. at 295, 87 S.Ct. at 1969 (identification one and a half days later).

**8.** The four factors are length of delay, reasons for delay, assertion of the right to speedy trial, and prejudice caused to the defendant. *Barker, supra,* 407 U.S. at 530, 92 S.Ct. at 2192; *see also Graves, supra,* 490 A.2d at 1091. No one factor is either sufficient or essential, instead a "difficult and sensitive balancing process" is required. *Barker, supra,* 407 U.S. at 533, 92 S.Ct. at 2193. *See also Head v. United States,* 451 A.2d 615, 621 (D.C.1982) (significant delay chargeable to government not sufficient by itself). We must be very careful in evaluating claims of speedy trial violations, because the remedy is dismissal of the indictment. *See Bethea v. United States,* 395 A.2d 787, 790 (D.C. 1978) (remedy); *United States v. Bolden,* 381 A.2d 624, 625, 629 (D.C.1977) ("drastic remedy of dismissal").

on February 6, 1984. On March 21, 1984, appellant was informed that an indictment had been returned against him, and he entered a not guilty plea and demanded a jury trial. Trial was set for April 19, 1984. On April 19, defense counsel stated that "there are no outstanding discovery matters at this time," but asked that a blood analysis be done, and made available to the defense, of a bloodstain that had been found on a small piece of plastic from the covering of one of Mr. Angel's windows. The trial court agreed, and trial was set for September 5, 1984.

On August 28, 1984, appellant filed a written motion to dismiss the indictment or, in the alternative for a continuance, on the ground that the government had failed to comply with the discovery request that the court, on July 30, 1984, had ordered the government to provide by August 3. The motion did not request a speedy trial.

On September 5, 1984 the defense orally pressed its motion to dismiss because the government still had not complied with the order to produce the blood sample. The trial court noted that appellant's motion to dismiss was also, in the alternative, a motion to continue. The defense stated that it was unable to go forward without the blood sample and wanted to do its own analysis.[9] The prosecutor moved for a continuance, and the defense, noting that appellant would probably not be granted a continuance if the roles were reversed, asked that the continuance be charged to the government. The court granted both requests. Defense counsel was unavailable on the court's proposed trial date of October 3, however, and the trial court suggested February 1, 1985; defense counsel replied "That is fine, Your Honor."

On February 1, 1985, the defense was ready for trial. However, the government was not ready for trial because its most important police witness was on emergency leave to stay home with a sick child. The trial court rescheduled trial for February 4, the next Monday, over the defense attorney's objection that he would prefer a continuance because he had another trial the next week.

On February 4, 1985, the defense was ready. The prosecutor, when was asked if he was ready, answered "Yes and no, Your Honor. I have all my witnesses here, but have a personal problem." The trial court asked if someone else could try the case, and then rescheduled it for February 6, 1985. This was designated as a government continuance.

On February 6, the defense was again ready but the appellant had been stepped back in another burglary case. Defense counsel agreed that "since he's now picked up on another case that kind of throws it all into— ... a state of flux."[10] The matter was passed until the afternoon, and then trial on the 1984 charges was continued until April 16, 1985.

On April 16, 1985, the case was continued to June 4, 1985, at the defense attorney's request, while the defendant was incarcerated on another matter. On June 4, the trial was again continued, until June 21, 1985, at the request of the defense, this time because a defense witness was incarcerated in Maryland. The defendant was also being held on other charges. Defense counsel noted, in his written motion for a continuance, that "[s]ince Mr. Turner is presently serving a sentence, and since [the witness] is an essential witness, he is not prejudiced by the delay." On June 19, the case was continued until June 24 in order for the judge to attend a judicial conference.

On June 24, 1985, the following exchange took place between defense counsel and the trial judge:

---

9. The prosecutor stated that he had been unable to locate the blood sample because he had "been unable to ascertain the exact evidence identification number." He first said he could have the blood sample in two weeks, and then promised to inform the court, by the end of the day, "whether or not we have the property or whether or not we can locate it or whether it is lost."

10. The trial court thought "[h]e's going to be presented on a new case probably today as well." The judge stated that "we can pass this matter to see what's—I don't know what's going to happen."

[DEFENSE COUNSEL:] [W]e would ask for the earliest possible date in view of the circumstances, Your Honor. I understand a previous continuance was at our motion, but notwithstanding that, we are keen to proceed as quickly as possible. [THE COURT:] Is he serving a sentence now?

[DEFENSE COUNSEL:] Yes ... he is now parole eligible on that sentence, and the fact that he has pending cases is— affects his—

[THE COURT:] That does, that impacts on the matter.

The prosecutor did not have a trial date open until September, and defense counsel was on vacation for the first two weeks of that month. Defense and government counsel suggested that appellant's 1984 case be substituted for his 1985 case, which was set for trial on September 23.[11]

On September 23, 1985, the parties again agreed to substitute the 1984 case for appellant's 1985 case, but the 1984 case was continued for trial until October 7 while the 1985 case was continued for a status conference on October 7. The record does not reveal why trial on the 1984 case did not begin on September 23.

Trial was delayed from October 7 to October 9 due the prosecutor's illness. On October 9, the defense was ready for trial. However, the prosecutor was unprepared, stating that "I was not aware the case was up for trial today," although the trial court

stated that the prosecutor should have known, since the case had been "trailing" since before his illness. The defense made an oral motion to dismiss. The court decided to continue the case. The court wanted to continue the case until the next day, but the prosecutor already had two cases continued for that day. Defense counsel also noted that "October is pretty crowded, but I have a lot of free days in November, December," and the defense and prosecution agreed on December 5 as a trial date.

On December 5, the case was continued for a day because the trial judge was in trial and there were no other available judges to whom the case could be certified. On December 6, trial was set for January 16, on which day trial commenced.

### B.

Length of and Reasons for Delay: Almost twenty-four months passed between appellant's arrest on January 23, 1984, and his trial on January 16, 1986. This is a "substantial delay," and twice the length of time that "creates a presumption of prejudice and shifts the burden to the government to justify the delay." [12] *Graves, supra,* 490 A.2d at 1091 (citations and footnote omitted). The greater the delay, the greater the burden, which is also heavier for an uncomplicated offense than a complex case.[13] *Bethea, supra,* 395 A.2d at 791.

---

11. The court also set the 1985 case for October 7.

12. *Cf. Barker, supra,* 407 U.S. at 530, 92 S.Ct. at 2192 (length of delay is "to some extent a triggering mechanism" for inquiry into the other factors); *Doggett v. United States,* — U.S. —, —— & n. 1, 112 S.Ct. 2686, 2690–91 & n. 1, 120 L.Ed.2d 520 (1992); *Graves, supra,* 490 A.2d at 1091 & n. 7 (citing cases finding no Sixth Amendment violation even where greater than twenty-five months of delay); *Bolden, supra,* 381 A.2d at 627 (twelve month delay triggers analysis); *Bowman v. United States,* 385 A.2d 28, 30 n. 3 (D.C.1978).

13. The Court stated in *Barker, supra,* that:
[D]ifferent weights should be assigned to different reasons [for delay]. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such

as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.
407 U.S. at 531, 92 S.Ct. at 2192. This court has also "in effect, created an intermediate category of 'significant' delay for government actions deemed less culpable than deliberate foot-dragging to gain tactical advantage but more culpable than the neutral category exemplified by failure to advance trial dates due to court congestion." *Graves, supra,* 490 A.2d at 1092 (citations omitted). These characterizations are used "merely as rough benchmarks." *Id.* The court has, in addition, used a more detailed system of "neutral + " and "neutral − " delay, which are counted against the government a

■ The seven months between appellant's arrest on January 23, 1984 and his first trial date of September 5, 1984, were completely neutral institutional delays which should be charged against the government but not weighed heavily.[14] *See Graves, supra,* 490 A.2d at 1092.

■ The government should be charged with one month of significant delay, from September 5 to October 3, because that delay was caused by its employees' inability to find the evidence.[15] As the government concedes, it is also chargeable with significant delay from February 4 to February 6, 1985, due to personal problems of the prosecutor. Other delay (October 3 to February 1, 1985), partially caused by scheduling conflicts and court congestion, as well as by the prosecutor's failure to comply with discovery, is charged to the government as neutral delay.[16] But, a three-day delay (February 1 to 4, 1985), caused by the government's "most important" police witness being on emergency leave, being a valid reason for delay, is not charged against the government.[17]

■ The next four and a half months of delay are chargeable to appellant. The case was continued from February 6, 1985 to April 16, 1985, because he was in jail on another charge. *See (Robert) White, supra,* 484 A.2d at 557–58. Continuances from April 16, 1985 to June 4, 1985, and from June 4 to June 21, 1985, were requested by appellant because a defense witness was in jail and therefore unavailable. *See Sanders v. United States,* 550 A.2d 343, 346 (D.C.1988).

■ Delay occurring from June 21, 1985 to June 24, 1985, as a result of the judge's attendance at a judicial conference, is neutral delay. *See Graves, supra,* 490 A.2d at 1097 (judge unavailable because of another trial, neutral delay). *But see Lemon, supra,* 564 A.2d at 1377 (prosecutor unavailable because completing another trial, significant delay). Subsequent delay to September 23, 1985, due to trial court congestion, is also neutral delay, weighed against the government but not heavily. *See Graves, supra,* 490 A.2d at 1093–94; *Sanders, supra,* 550 A.2d at 346.

On September 23, 1985—a year having passed since the original trial date—the

little more and a little less heavily than neutral delay, respectively. *Graves, supra,* 490 A.2d at 1097–98 n. 12.

**14.** *See Gayden v. United States,* 584 A.2d 578, 584 (D.C.1990), *cert. denied,* — U.S. —, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991); *Lemon v. United States,* 564 A.2d 1368, 1377 (D.C.1989); *Miller v. United States,* 479 A.2d 862, 866 (D.C. 1984); *Head v. United States,* 451 A.2d 615, 621 (D.C.1982); *cf. Doggett, supra,* — U.S. at —, 112 S.Ct. at 2693; *Day v. United States,* 390 A.2d 957, 966 (D.C.1978), *overruled on other grounds by Graves, supra,* 490 A.2d at 1086. Some delays due to court congestion are given "substantial" weight where they are the product of "government indifference," i.e., government failure to take available steps to hasten trial. *Bethea, supra,* 395 A.2d at 791–92 (government's only response to further continuances was a motion to advance the trial date). In the instant case the prosecutor cooperated with defense counsel in switching appellant's 1984 and 1985 cases, seemingly with the goal of advancing the trial in the instant (1984) case. *Bethea* is also distinguishable because it involved long, significant delays chargeable to the government and the defendant was able to make a showing of anxiety-type prejudice.

**15.** *Cf. Cates v. United States,* 379 A.2d 968, 971–72 (D.C.1977) ("An understaffed prosecutor's office that is unable rapidly to follow up on fugitives ... may be a factor which could be weighed against the government," although government had located defendant "within a reasonable length of time" in that case). *But see Day, supra,* 390 A.2d at 966 (delay from prosecutor's continuances caused by defendant's discovery requests not chargeable to government; no indication prosecutor had been negligent or overly slow).

**16.** This is more like neutral + delay because the delay was originally caused by the government. *Cf. Graves, supra,* 490 A.2d at 1092–93 (delay caused by government-requested continuances, one of which was due to the prosecutor's need for more time to prepare, was chargeable to government more heavily than institutional delay but was not "significant" delay); *id.* at 1093 (delay caused not solely by court congestion but also by defense counsel's scheduling conflicts weighed less heavily than neutral delay entirely caused by court congestion).

**17.** *See (Reginald) Jackson v. United States,* 503 A.2d 1225, 1228 (D.C.1986). *But see (Robert) White v. United States,* 484 A.2d 553, 558 (D.C. 1984). *Compare Graves, supra,* 490 A.2d at 1093 & n. 9, 1095; *Lemon, supra,* 564 A.2d at 1377.

trial court and parties agreed to continue the case for trial on October 7, 1985. The reason for this delay is unclear from the record on appeal. For purposes of this appeal, we assume without deciding that this two-week period is properly characterized as significant delay. *See Graves, supra,* 490 A.2d at 1091 (if delay is longer than one year, government has burden of justifying delay) (citations omitted).

■■■ Trial was delayed from October 7 to October 9, 1985, because of the prosecutor's illness, two days not counted against the government. *See Graves, supra,* 490 A.2d at 1093. *But see Head, supra,* 451 A.2d at 621 (two-month delay charged against government). If the delay after the prosecutor's return had been due solely to court congestion and counsels' scheduling problems, the post-illness period would have been neutral delay. *See Graves, supra,* 490 A.2d at 1093–94. However, the trial judge and defense counsel were prepared for trial on October 9, and the subsequent delay was caused by the prosecutor's unpreparedness and therefore is significant delay.[18] *See Lemon, supra,* 564 A.2d at 1377. Because defense counsel's scheduling difficulties prolonged the delay, however, the two months should be charged to the government less heavily than significant delay but more heavily than institutional delay.[19]

■■ The final delay, from December 5 and then December 6, 1985, to January 16, 1986, was caused by the trial judge's unavailability and is chargeable to the government as neutral delay. *See Graves, supra,* 490 A.2d at 1097.

To summarize, appellant concedes responsibility for seven months of the delay.[20] One month, two weeks, and two days were chargeable to the government as significant delay, twelve months were chargeable to the government as neutral delay, six months were chargeable to the government as neutral + delay, and five days were justified.[21] Most of the delay was neutral, and there was more delay chargeable to appellant than significant delay chargeable to the government.

## C.

■■■ Assertion of Right. A defendant's assertion of his right to speedy trial is "entitled to strong evidentiary weight."[22] *Barker, supra,* 407 U.S. at 531, 92 S.Ct. at 2192. Also relevant are the timing, frequency, strength, and possible

---

18. When the prosecutor returned after his illness, he was unprepared for trial, defense counsel was busy for most of October, and the trial was rescheduled for December 5, 1985.

19. In other words, as neutral + delay. *Cf. Graves, supra,* 490 A.2d at 1092–93.

21. The delays were as follows:

| Dates | Length | Reason | Characterization |
|---|---|---|---|
| 1/23/84 – 9/05/84 | 7½ months | court congestion | neutral |
| 9/05/84 – 10/3/84 | 1 month | discovery failure | significant |
| 10/3/84 – 2/01/85 | 4 months | scheduling conflicts after discovery failure | neutral+ |
| 2/01/85 – 2/04/85 | 3 days | witness unavailable | justified |
| 2/04/85 – 2/06/85 | 2 days | personal problems | significant |
| 2/06/85 – 6/21/85 | 4½ months | defense continuances | defendant |
| 6/21/85 – 6/24/85 | 3 days | judicial conference | neutral |
| 6/24/85 – 9/23/85 | 3 months | court congestion | neutral |
| 9/23/85 – 10/7/85 | 2 weeks | unclear | significant |
| 10/7/85 – 10/9/85 | 2 days | prosecutor ill | justified |
| 10/9/85 – 12/5/85 | 2 months | scheduling conflicts after prosecutor unprepared | neutral + |
| 12/5/85 – 1/16/86 | 1½ months | court congestion | neutral |

22. Delay occurring after the defendant asserts his right to a speedy trial is weighed more heavily. *(Reginald) Jackson, supra,* 503 A.2d at

20. We find appellant responsible for only four and a half months of delay.

1228 (citation omitted); *Graves, supra,* 490 A.2d at 1094; *Bethea, supra,* 395 A.2d at 792.

ulterior motives of such an assertion.[23] Appellant did not early and strenuously assert his right to a speedy trial. In fact, he never explicitly asserted his right to a speedy trial, and can be deemed to have asserted his right at the earliest on June 24, 1985, six and a half months before trial actually commenced.[24]

■ Appellant's motion of August 28, 1984 did not seek a faster trial, but dismissal of the charges or a continuance.[25] The right to a speedy trial was never mentioned, and appellant did not request that his trial date be advanced to an earlier date.[26] Appellant concedes that the motion was "not based on the Sixth Amendment per se." While a motion to dismiss is "some indication of desire for a speedy trial," its significance is diminished by the failure "to move in the alternative for an immediate trial." *Graves, supra,* 490 A.2d at 1100; *Miller, supra,* 479 A.2d at 866 (citations omitted); *see also Sell,* supra, 525 A.2d at 1024–25 (citing cases).

■ At a June 24, 1985, status conference, when defense counsel stated that ap-

pellant wanted to be tried as quickly as possible, his request appears to have been motivated not as much by desire for prompt trial as by the effect of the pending charges on his parole eligibility for another offense.[27] *See Graves, supra,* 490 A.2d at 1098. Furthermore, the fact that defense counsel also agreed to several continuances dilutes any assertion he may have made for a speedy trial. *See Bowman, supra,* 385 A.2d at 31.

■ Appellant's October 9, 1985, motion to dismiss also did not explicitly seek a speedy trial, and the trial court continued the case.[28] Defense counsel stated that "if ... the Government isn't ready, it's up to them to sort out the communications within the U.S. Attorney's office.... And if they can't do it, then they can always re-indict, if they feel strongly enough about it. But at this time, we'd move to dismiss this case." Although not using the words "speedy trial," this motion to dismiss was a reaction to the latest of a long series of delays.[29] Still, it will be weighed less heavily because defense counsel

---

23. *See Head, supra,* 451 A.2d at 621 (early assertion of the right is an "extremely important factor"); *Day, supra,* 390 A.2d at 970 (defendant seemed interested in dismissal, not earlier trial); *Bethea, supra,* 395 A.2d at 792; *Miller, supra,* 479 A.2d at 867 (examine "force and frequency" of assertions) (citation omitted); *Lemon, supra,* 564 A.2d at 1378 n. 19 (tactical reason for seeking speedy trial); *Sell v. United States,* 525 A.2d 1017, 1024–25 (D.C.1987).

24. *See Graves, supra,* 490 A.2d at 1098 (importance of explicit assertions of the right).

25. The motion stated:

> Under the circumstances the government's inactivity is inexcusable. *Merely continuing [sic] the case and charging the continuance to the government is too mild a sanction.* The correct remedy, *it is respectfully submitted, is* to dismiss the indictment entirely. It is in the long term interests of justice for the rules of discovery and for court orders to be followed.

(emphasis added). Although defense counsel's reference to "charging the continuance to the government" appears to be in the nature of speedy trial terminology, these statements were made in the context of a motion based on the government's failure to comply with a discovery request, not on allegations that appellant's right to speedy trial was being jeopardized.

26. However, such a request would have been incompatible with defendant's assertion that he could not go forward without the blood sample.

27. Defense counsel stated at the status conference that:

> we would ask the earliest possible [trial] date in view of the circumstances, Your Honor. I understand a previous continuance was at our motion, but notwithstanding that, we are keen to proceed as quickly as possible.

The trial judge was informed that appellant was presently serving a sentence, and defense counsel added that "he is now parole-eligible on that sentence, and the fact that he has pending cases is—affects his—," to which the judge replied "[t]hat does, that impacts on the matter."

28. The prosecutor had just returned from an illness and was not prepared for trial. The case had been continued on October 7, due to the illness, but apparently the government did not inform appellant, defense counsel, or any witnesses that the prosecutor would also be absent on October 8.

29. To this extent, therefore, the government errs in claiming that appellant did not assert his speedy trial right after he was released from custody around September 23, 1985, and that therefore he was interested in trial only as a way to hasten parole and end his confinement.

sought dismissal rather than immediate trial.[30]

Thus, appellant's alleged assertions of his speedy trial right were not so clear, explicit, forceful, or frequent as to be weighed heavily in the speedy trial analysis. Nor is it clear before October 9, 1985, that appellant desired an immediate trial rather than seeking dismissal of the charges or release on parole in another case.

### D.

▪▪▪▪▪ Prejudice to Defendant.[31] Appellant concedes that it is difficult for him to show prejudice to his ability to present a defense.[32] He argues that his witnesses' credibility was diminished by the time delay, but the credibility of prosecution witnesses would have been similarly affected.[33] "The absence of this most serious form of prejudice weighs heavily in our determination of whether appellant was deprived of his right." *Graves, supra,* 490 A.2d at 1103. *Cf. Doggett, supra,* —— U.S. at ——, 112 S.Ct. at ——. *See also Gayden, supra,* 584 A.2d at 585.

Appellant was not incarcerated pending trial in the instant case, although he did suffer some restraints on his liberty, such as having to report for drug testing, weekly surveillance, and drug treatment, and being released into third-party custody.[34] While prejudice may include the anxiety caused by pending charges, appellant makes no attempt to allege any particularized harm—psychological, economic, or other—to his family relationships, mental well-being, job prospects, or any other aspect of his life.[35] Moreover, appellant's other contact with the criminal justice system, in the form of five prior convictions, lessens any anxiety these pending charges caused him.[36]

### E.

Conclusion: Most of the almost twenty-four months of delay between appellant's arrest and trial was due to neutral reasons and therefore charged against the government, but weighed lightly. There is no indication that the government deliberately delayed in an attempt to gain a tactical

---

**30.** Appellant also made several motions for bond review. Even if viewed as equivalent to motions for release, the motions should still be given very little weight because they did not explicitly press for a speedy trial. *See Graves, supra,* 490 A.2d at 1099.

**31.** This factor is examined in terms of interests sought to be protected by the speedy trial right. *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193; *see also Graves, supra,* 490 A.2d at 1101. These interests are "prevent[ing] oppressive pretrial incarceration; ... minimiz[ing] anxiety and concern of the accused [caused by pending charges]; and ... limit[ing] the possibility that the defense will be impaired." *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193 (citations omitted). *See also Graves, supra,* 490 A.2d at 1101. The last element is the most important, although it is not essential to a speedy trial claim. *See Moore v. Arizona,* 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973) (citation omitted); *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2192; *Parks, supra,* 451 A.2d at 602–03. *See also Bethea, supra,* 395 A.2d at 793; *Day, supra,* 390 A.2d at 970.

**32.** *Cf. Barker, supra,* 407 U.S. at 532–33, 92 S.Ct. at 2193 (listing possible kinds of prejudice); *Graves, supra,* 490 A.2d at 1102, 1105 (no harm to ability to defend); *Sanders, supra,* 550 A.2d at

346 (claims of prejudice were mostly "bare assertions").

**33.** At one point, defense counsel stated that appellant would suffer no prejudice were his trial continued from June 4 to June 21, 1985.

**34.** Appellant was on probation when arrested. His probation was revoked and he was incarcerated, for reasons not clear from the record. While a defendant already imprisoned may still suffer prejudice from trial delays, appellant has made no such showing here. *See Moore v. Arizona, supra,* 414 U.S. at 27, 94 S.Ct. at 190 (pending charges may affect defendant's chances for "parole and meaningful rehabilitation"); *Day, supra,* 390 A.2d at 972 (prejudice possible· for defendant already incarcerated); *Bowman, supra,* 385 A.2d at 32 (same) (citations omitted).

**35.** *See Gayden, supra,* 584 A.2d at 585 (must show specific effects of anxiety) (citation omitted); *Parks, supra,* 451 A.2d at 603 ("'mere assertion' of anxiety" not enough) (citation omitted).

**36.** *See Graves, supra,* 490 A.2d at 1104; *(Reginald) Jackson, supra,* 503 A.2d at 1229; *Bolden, supra,* 381 A.2d at 629; *Parks, supra,* 451 A.2d at 603.

advantage.[37] *See Bolden, supra,* 381 A.2d at 628, *cf. Doggett, supra,* —— U.S. at ——, 112 S.Ct. at 2693. Appellant did not assert his right to a speedy trial explicitly, clearly, early, and without ulterior motive to merely shorten his confinement on another charge. Appellant has not shown prejudice caused by the delay. Accordingly, we conclude that appellant has failed to demonstrate that his right to a speedy trial was violated.[38] While the delay was regrettable, particularly in view of the fact that more than a year passed after the first trial date before any effort was made to advance the trial, it does not rise to the level of a constitutional violation.[39]

---

**37.** Defense counsel seemed to admit that there was no bad faith on the government's part when the prosecutor was temporarily unable to locate evidence in response to a discovery request. The trial court noted, however, that this particular prosecutor's cases never seemed to move.

**38.** *Cf. Barker, supra,* 407 U.S. at 534, 92 S.Ct. at 2194 ("extraordinary" more-than-five-year delay between arrest and trial, and fact that "a good part of that period was attributable to the failure or inability to try [defendant] under circumstances that comported with due process," outweighed by minimal prejudice (ten months in jail) and weak assertion of speedy trial right (several times un-explicitly, later objecting to continuances)); *Head, supra,* 451 A.2d at 622 (twenty-nine month delay, most of which was charged to the government as neutral, outweighed by lack of prejudice, complexity of case, and fact that defendant asserted speedy trial right early but then concurred in continuances); *Day, supra,* 390 A.2d at 973 (two years of significant delay chargeable to government outweighed by lack of prejudice and failure to press sufficiently hard for speedy trial, simple mugging case).

**39.** The trial judge seemed concerned about and aware of the delay throughout the trial process.